40 N.J. Super. 247 (1956)
123 A.2d 30
CAROLINE D. TRAUTWEIN, ET ALS., PLAINTIFFS-APPELLANTS,
v.
CLIFFORD HARBOURT, ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1956.
Decided May 16, 1956.
*250 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Harry Green argued the cause for plaintiffs-appellants (Mr. Arthur S. Kelsey, attorney).
Mr. John Claud Simon argued the cause for defendant-respondent Bertha Leatham.
Mr. Baruch S. Seidman argued the cause for defendant-respondent Anna Carroll.
Mr. August C. Ullrich argued the cause for the remaining defendants-respondents (Messrs. Burton and Seidman and George L. Burton, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
The first question to be decided here is whether the plaintiffs were expelled, individually and as a subordinate chapter, from the Order of the Eastern Star, *251 a fraternal organization of New Jersey, or, rather, whether they were denied admission thereto. As we shall show, the case presented is essentially one of exclusion rather than expulsion. On this premise, the second and principal question brought to focus by our analysis of the issues is whether and in what circumstances members of a strictly fraternal organization are liable in damages to aspirants to membership therein for willful and concerted activity successfully carried on within the organization to keep them from being admitted.
The plaintiffs, some 58 individuals residing in or near Mercer County, had, for about three years prior to 1953, been endeavoring to gain admission to the order as a new chapter in the Seventh District, which then comprised twelve chapters in the vicinity of Trenton. Some of them were already affiliated with other chapters. Most of the plaintiffs are women. Qualifications for membership in the Eastern Star for a female consist of relationship in specified degree to a member of the Masonic fraternity in good standing; for a male, that he be a Mason in good standing. Most of the defendants, who number seven, are members and past or present officers of existing chapters in District 7. An understanding of the history of plaintiffs' efforts to obtain admission as a new chapter and of the nature of the campaign of resistance attributed to the defendants requires some reference to the constitution and by-laws of the Grand Chapter (statewide governing body).
The absolute admission of a new chapter into the order requires the issuance of a charter by the Grand Chapter. A proposed new chapter may, however, be formed (instituted) and begin its work within the order prior to the issuance of a charter, upon dispensation by the Most Worthy Grand Patron, who, in conjunction with the Most Worthy Grand Matron, is the chief executive officer of the Grand Chapter. Written notice of any petition for dispensation is required to be given within ten days to all chapters in the district of the proposed new chapter. Within 30 days each such chapter is required to notify the Grand Patron of its position *252 on the application; and, if it is opposed, to state the reasons therefor. Objections are required to be referred to the Committee on Dispensation and Charters, which, together with the Grand Matron, investigates the objections and attempts to solve them harmoniously. If there are no objections, the Grand Patron may issue the dispensation, and institution then takes place. This operates to terminate the prior membership in any other chapter of any individual in the new chapter. Every chapter under dispensation must present a petition for a charter to the Grand Chapter at its next annual session held not less than sixty days subsequent to institution. The petition is submitted to the committee aforementioned, and "the Grand Chapter may grant or deny the petition or it may grant a continuance of the dispensation until the next annual session."
Many of the present plaintiffs, as a group, applied for a dispensation to form the proposed Marshall Chapter in 1950. Upon adverse report of the Committee on Dispensation and Charters, dispensation was withheld. Another petition by the same group, styled the proposed Emma E. Ferrier Chapter, was filed in December, 1951, and at the annual session of the Grand Chapter in May 1952 a report of the Committee on Dispensation and Charters recommending that the petition be laid over for further consideration was approved. On July 31, 1952 the same group, now under the name of Mercer Chapter, filed another petition with Hector E. MacDonald, Most Worthy Grand Patron. The following account of further events is culled from answers to interrogatories and extensive depositions taken from all of the defendants, many of the plaintiffs, and from others, giving the plaintiffs the benefit of all reasonable inferences and of conflicts of fact.
On his way to a meeting of the proposed chapter in August 1952 MacDonald visited the home of the defendant Bertha Leatham, Grand Secretary of the Grand Chapter, a past Grand Matron of the Grand Chapter, and a member of Victory Chapter in the Seventh District. She was disturbed about the prospect of a dispensation being issued to the new *253 group. She told MacDonald that the proposed Worthy Patron of the new chapter, Wesley Van Buskirk, had insulted a past Grand Matron of the order, had once appeared at her chapter and there called her a liar, and had been in trouble over a traffic violation. She said she hoped there would never be a new chapter in the Seventh District. Van Buskirk testified that at a meeting of Victory Chapter in 1950, when it was considering the application of the proposed Marshall Chapter, Bertha Leatham stated that there was no need for another chapter in the Seventh District and that the applicants were unfit and quarrelsome; and that she told him that he had lied to her and that there would never be another chapter formed in the Seventh District as long as she lived.
MacDonald called a meeting at Princeton, September 1, 1952, of all the patrons, matrons and associate matrons of the chapters in the Seventh District and discussed with them an analysis he had made indicating the capacity of the district to absorb a new chapter. During the month of September 1952, however, he received letters from every chapter in the district stating opposition to the grant of a dispensation. The same group of Seventh District leaders, including many persons not defendants in this action, met again at Princeton September 28, 1952, to further the opposition to the dispensation. MacDonald asked them for specific objections to the membership of the new group, and the defendant William D. Morgan, a member and past patron of Nottingham Chapter in the Seventh District, said, "Would you put a rotten apple in a barrel of apples?"
On November 9, 1952, at a meeting in Trenton of the patrons, matrons and associate matrons of the Seventh District, a discussion of the proposed Mercer Chapter ensued. The defendant Clifford Harbourt, a past Grand Patron of the Grand Chapter and a member of Nottingham Chapter, was chosen as chairman of the movement to prevent its admission. Thereafter a mass protest meeting was planned. In response to a letter from Harbourt inviting him to the mass meeting, MacDonald wrote advising that he saw no purpose in doing so, that the leaders of the new chapter were *254 Master Masons and Eastern Star members in good standing; that the "group action" by the Seventh District chapters was unwarranted and showed "a vicious intent to violate the pledge" not to speak evil or perform acts of unkindness or injustice to a sister or brother; and that institution of the new chapter would take place December 15, 1952. On November 16, 1952 the district mass meeting was held at the War Memorial Building in Trenton. All past grand officers were invited. There was a large attendance. Harbourt presided. The defendants John Palmer, past patron of a Trenton chapter, Isabelle Hickman, past matron of a Seventh District chapter, and Harbourt, took an active part in developing the opposition to the new chapter. The primary basis for the objections voiced was that an additional chapter was not needed in the district. The point was also made that a dispensation would be contrary to the action of the last session of the Grand Chapter which had laid the matter over for a year. A member of the Grand Chapter Committee on Dispensation and Charters was asked to report adversely to the forthcoming annual session of the Grand Chapter. Palmer stated that 3,000 members (the total membership in the Seventh District) had voted against the charter, apparently referring to the resolutions of opposition by all the chapters; also that the situation was "deteriorating into one of quantity rather than quality." Isabelle Hickman said: "We will have to stand them from December to May and that will be the end of it." On her motion it was resolved to communicate the opposition of the Seventh District to all of the chapters in the state.
On December 10, 1952 a letter was composed at a meeting of patrons, matrons and associate matrons of the Seventh District chapters and sent out under the heading, "Twelve Chapters of the Seventh District," to all other chapters. Isabelle Hickman participated in its preparation, and William Morgan signed it as a Worthy Patron. It referred to the forthcoming institution and expressed deep grief and shock that "in spite of overwhelming opposition * * * it is being forced upon us." It implied the new chapter was *255 not "needed" and that its institution was not "in the true spirit" of the order. It stated none of the members of the Seventh District chapters would attend the institution. The dispensation was issued by the Grand Patron, with the concurrence of the Grand Matron, and the Mercer Chapter was instituted December 15, 1952.
Another meeting of the Seventh District leadership took place in April, 1953, apparently to organize the presentation of the case against the grant of charter at the annual Grand Chapter session scheduled for May, 1953. Some of the defendants more euphemistically described the purpose as being to prevent confusion and unmannerliness at the Grand Chapter.
At the annual grand session at Atlantic City, May 21, 1953, the Committee on Dispensation and Charters reported concurrence in the recommendation for a grant of charter by the Grand Patron and Grand Matron. There was extended discussion of the matter on the floor. The plaintiffs emphasize the following statements and actions by defendants. The defendant Hickman read a letter which had been sent to MacDonald by Darcy Chapter in September 1952, objecting to the new chapter and stating that the same group had been turned down before and that "a leopard doesn't change his spots." She was also quoted as having said the chapter "was born of untruthfulness, unkindness, without charity" and that the applicants were "unfit to be Eastern Star." The defendant Emily Strachan said Van Buskirk was "impetuous, belligerent and irresponsible," that the leaders of the proposed chapter were "not conducive to harmony" which had existed in the district and that the members were not "Eastern Star material." The defendant Morgan stated that 50% of the population of Trenton was "Catholic" and 17% "colored" and that since neither of these categories joined the Eastern Star, the remaining population of the Trenton area was not sufficient to require more chapters. According to plaintiff Caroline Trautwein, one of the prime movers in the Mercer Chapter, Morgan also stated that "if we were going to fill our chapter with Catholics it wasn't right," *256 but shortly after in her deposition she indicated that Morgan "was inferring" the foregoing. None of the eight other plaintiffs or of the eleven other witnesses who were present at and testified concerning the events of the grand session mentioned the last remark attributed by Trautwein to Morgan. An answer to interrogatories, executed by one plaintiff on behalf of all, states, on information and belief, that defendants Hickman, Leatham, Harbourt, Palmer, Morgan and Strachan "instituted a whispering campaign, the gist of which was that Mercer Chapter had a Catholic sponsor and that some of the proposed members were Catholic." At the grand session Morgan also described the new group as the "scum" or the "scrapings" from the bottom of the barrel which would spoil the barrel of "good apples." Harbourt said that he was a good judge of character and that the plaintiffs, some of whom in attendance he pointed out, were not Eastern Star material. He said 3,000 people had voted against the chapter and would resign if the charter were granted. At the meeting door Palmer pointed out some of the plaintiffs to other delegates and referred to them as the "riff-raff" of Mercer County. During the meeting he paced the aisles and spoke to groups of delegates.
Speaking in favor of granting the charter, in addition to the dispensation committee chairman, were the Grand Patron and Grand Matron. A standing vote was taken, and the motion to grant the charter was declared lost. Thereupon a motion was made and carried that "demits" (in the nature of certificates of severance) be granted to all the members of Mercer Chapter U.D. [under dispensation], and some months later the defendant Anna Carroll, Associate Grand Matron at the time of the grand session, mailed them out, being Grand Matron at the time. More as to this. This defendant, who was not in the Seventh District, had no other connection with the activities of the other defendants complained of herein.
Each of the defendants except Palmer was asked on depositions and answered in the negative the question as to whether he or she knew anything derogatory concerning any *257 of the plaintiffs. Palmer testified that plaintiffs Sims and Trautwein were persons of good reputation.
The plaintiffs brought this action, charging, in separate counts on behalf of each plaintiff, that the seven defendants named above, commencing about September 1952, "wilfully and maliciously" agreed and conspired to destroy the good name, character and reputation of the plaintiffs as members of the Mercer Chapter and as members in good standing of the order; to discredit those of the plaintiffs who were to be officers; to prevent Mercer Chapter from obtaining a charter either under dispensation or by vote of the Grand Chapter; and to make each plaintiff "an outcast of and from said order." The acts aforementioned and others of similar import attributed to defendants were set forth in detail, and it was recited, in effect, that plaintiffs were (a) held up to the contempt, scorn, etc., of members of the Eastern Star, were injured in character and reputation and sustained injuries to their feelings; (b) deprived of their membership in the order and its attendant rights and privileges; and (c) deprived "for all practical purposes" of any opportunity again to become a member of a chapter in the Seventh District. Each plaintiff sought compensatory damages of $25,000 and punitive damages in amounts varying from $10,000 to $25,000 from each of the defendants.
Defendants answered, denying the conspiracy and entering separate defenses of privilege and assumption of risk or the equivalent thereof. Thereafter motions for summary judgment, based upon the pleadings, depositions, answers to interrogatories and admissions on file, were made by all of the defendants, and the Law Division granted judgment final in favor of all the defendants except Morgan, denying the motion as to him. No opinion was filed. Plaintiffs appeal.
A discussion of the issues presented requires a precise understanding of the cause of action which plaintiffs purport to assert. In reciting the acts allegedly done by the defendants in furtherance of the agreement and conspiracy charged, it is stated in the complaint that "they used false and malicious, and defamatory, slanderous and libellous statements, *258 uttered and published by them" of and concerning the plaintiffs "as the means and to accomplish such wrongful, wilful and malicious purpose." There is, however, no sequential specification of the defamatory words. Moreover, there is no reference to defamation, libel or slander in the "statement of questions involved" in the plaintiffs' brief. See R.R. 1:7-1. The statement raises only the question of error in the decision by summary judgment of "issues of material facts" involving "wilful and malicious acts of defendants in * * * depriving plaintiffs of a chapter of their own in a fraternal order * * * causing their expulsions from said order and deprivation of their memberships and personal and property rights therein and injuries to their reputations and mental sufferings." In order to eliminate any doubt on this score, counsel for the plaintiffs was asked at the argument whether the action was one for libel or slander or inclusive of such a cause of action. The response was in the negative, it being stated expressly that the action was for "malicious injury,' as in the cases of Van Horn v. Van Horn, 56 N.J.L. 318 (E. & A. 1893), and Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934). It was further stated that the "conspiracy" charged was not the gist of the action but an "aggravating element" of the asserted wrong and that the statements by the defendants complained of were a part of the means by which the injury sued for was accomplished. The Van Horn case was an action for conspiracy to injure plaintiff in his business, brought against a business competitor, for false and malicious statements which resulted in a destructive loss of credit. The court held the action not one for slander and therefore not barred by the statute of limitations applicable to slander, notwithstanding there appears clearly to have been presented an incidental case of defamation. The Kamm case allowed recovery for a wrongful diversion to others and deprivation of a real estate broker's opportunity to earn a commission.
The present action thus not being or claimed to be for defamation, considerations applicable to that field are not directly involved herein, and our determination does not *259 imply any view as to whether the facts disclosed reflect a cause of action for or appropriate defenses to an action for libel or slander. An action for slander in this situation, parenthetically, would raise issues, among others, as to whether the statements were defamatory per se and as to actual damage, Prosser, Law of Torts (2d ed. 1955), pp. 588, 593, as well as whether the case presents a non-actionable "group defamation," Id., pp. 579, 583; see Kilpatrick v. Edge, 85 N.J.L. 7, 8 (Sup. Ct. 1913). The question which concerns us here is whether the record before the Law Division showed palpably that there was no genuine issue as to any material fact challenged and that the successful defendants were entitled to judgment of dismissal as a matter of law. R.R. 4:58-3. This, in turn, requires us to determine whether, drawing "all inferences of doubt" against defendants as movants, Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954), the facts which a jury could find on this record spell out such wrongfully willful and malicious conduct on the part of the successful defendants and such resulting injury to the plaintiffs as the law will hold requires redress by damages.

I.
The gravamen of plaintiffs' argument is that defendants' activities caused them to be expelled from and made "outcasts" of a fraternal order in which they were members. Defendants, on the other hand, contend there was but a denial of membership in a voluntary, private, fraternal organization. The resolution of this issue is our first concern, since the law accords important rights and status to members of voluntary organizations not extended to mere aspirants to membership therein. One wrongfully expelled from such an organization may be restored to membership by mandamus. Sibley v. Board of Management of Carteret Club of Elizabeth, 40 N.J.L. 295, 297 (Sup. Ct. 1878); O'Keefe v. William M. Barry Benevolent & Athletic Association, 74 N.J.L. 435 (Sup. Ct. 1907). Or he may bring an action for damages, *260 D'Aloia v. Unione Fratellanza, 84 N.J.L. 683 (E. & A. 1913). For a discussion of criteria of a lawful expulsion, see Chafee, "Internal Affairs of Associations not for Profit," 43 Harv. L. Rev. 993, 1014-1020 (1930). On the other hand, there is no "abstract right to be admitted" to membership in a voluntary association, Mayer v. Journeymen Stonecutters' Association, 47 N.J. Eq. 519, 524 (Ch. 1890), and a court will not compel the admission of a person to membership in such an organization who has not been elected according to its rules and by-laws, Leeds v. Harrison, 7 N.J. Super. 558, 569 (Ch. Div. 1950). The general rule is that there is no legal remedy for exclusion of such an individual from admission into a voluntary association, no matter how arbitrary or unjust the exclusion. 4 Am. Jur., Associations and Clubs, § 11, p. 462; 7 C.J.S., Associations, § 23, p. 56. The authorities cited by plaintiffs are almost entirely expulsion cases. As we shall see, there are no adjudicated cases which can be regarded as square holdings as to the existence of a right of action for damages for wrongful exclusion from a purely social or fraternal organization, and our consideration of that subject must perforce be based upon principle and the analogies of related torts. If, however, we were persuaded that the instant case is, as plaintiffs contend, truly one of expulsion from membership, the cases cited by plaintiffs would be pertinent.
We regard this matter as controlled by the constitution and by-laws of the order, of which the plaintiffs must be regarded as having had notice. It is clear from the organic provisions of the organization, to which we have already referred, that a sine qua non of the permanent subsistence of a new chapter within the order is the grant of a charter by the Grand Chapter at its next annual session held not less than 60 days subsequent to an institution pursuant to dispensation by the Grand Patron. The dispensation automatically expires at that session. "The Grand Chapter may grant or deny the petition" or lay it over for further consideration. There is no qualification upon the action of the Grand Chapter where it denies a charter outright. Every *261 accredited delegate to the Grand Session may vote on the question, and the action of the majority, on motion, in the course of ordinary parliamentary procedure, is conclusive of the status of the embryonic chapter. Insofar as the membership of any individual plaintiff was derivative through the institution of the Mercer Chapter by dispensation, and to the extent that the grievance here asserted is the loss of collective association as a chapter within the order, it is plain that no absolute right or status ever vested. All that arose was membership on a condition subsequent, a condition lying in the absolute will of the Grand Chapter. The status was inchoate. The rejection of the petition for a charter at the grand Session in May 1953 must, therefore, be held to have constituted an exclusion from the order and not an expulsion from it. The assumption of the conditional membership status by those who joined the Mercer Chapter under dispensation was entirely voluntary, and they must be deemed to have assumed the risk of any damage ensuing from adverse action on a permanent charter by the Grand Session.
Those of the plaintiffs who were affiliated with other chapters of the order and who lost their membership in the order when the charter was denied Mercer Chapter stand in no better stead than the others, notwithstanding their loss was greater. Under the rules of the organization, institution of a chapter also terminates any affiliation of a member formerly in good standing as a member of another chapter. But while his membership is changed from the chapter of prior affiliation to the chapter under dispensation, the risk of severed membership status implicit in the requirement that the proposed chapter obtain a charter from the Grand Chapter remains. Here, again, the plaintiffs in this category voluntarily assumed the risk of loss of their membership in the order. Defendants were not responsible for their voluntary termination of vested membership in other chapters. The entry into Mercer Chapter put these plaintiffs in a status identical with that of their previously unaffiliated fellows. It is not clear from the constitution and by-laws, which are discussed further hereinafter, whether or to what *262 extent plaintiffs were further injured by the mailing to them of demits by the defendant Carroll, as claimed. It suffices here to hold that the denial of the charter by the Grand Chapter was not an expulsion of the plaintiffs or an expulsion or forfeiture of the Mercer Chapter, but, rather, an exclusion of them from admission to the order. The authorities dealing with wrongful expulsions are thus not applicable.

II.
We come, then, to the question as to whether concerted activity of members of a strictly fraternal organization designed to exclude aspirants from admission thereto is actionable where such activity is confined within the organization but is actuated in substantial degree by motives legally classifiable under the head of malice.
As noted, the action here is for willful and malicious injury unjustifiably inflicted upon plaintiffs. Malice can be constructive or express. In the sense first stated, malice "is the intentional doing of a wrongful act without justification or excuse." Louis Kamm, Inc. v. Flink, supra (113 N.J.L., at page 588). But in that sense the incidence of malice is without real significance, as the liability postulated depends entirely upon the meanings with which the other terms in the definition are invested. Sometimes, however, tort liability depends upon express malice or similar subjective criteria, like bad faith, as where qualified privileges of action or statement are recognized as defenses to such torts as defamation. Prosser, op. cit., supra, pp. 614, 619. For example, the qualified privilege of a member of a voluntary association to discuss an applicant for membership, or the case of a member up on charges, with other members, does not in an action for defamation excuse his slandering the plaintiff if his primary motive is something other than the purpose of furthering the interest upon which the privilege is based, in such a case the common interest of fellow members of the association in the qualifications, conduct or character of the plaintiff. Prosser, op. cit., supra, *263 pp. 627, 628; Restatement, Torts, § 603 and comment. It has, moreover, been held that if ill will, personal resentment or spite partially motivates the statement, the privilege is destroyed. Cadle v. McIntosh, 51 Ind. App. 365, 99 N.E. 779, 782 (App. Ct. 1912); Cranfill v. Hayden, 75 S.W. 573, 577, 578 (Tex. Civ. App. 1903), reversed on another ground, 97 Tex. 544, 80 S.W. 609 (Sup. Ct. 1904); but see Grand Lodge Order Hermann's Sons of Texas v. Schuetze, 36 Tex. Civ. App. 539, 83 S.W. 241, 246 (Civ. App. 1904); cf. Reininger v. Prickett, 192 Okl. 486, 137 P.2d 595 (Sup. Ct. 1943); Fisher v. Myers, 339 Mo. 1196, 100 S.W.2d 551 (Sup. Ct. 1936); Berot v. Porte, 144 La. 805, 81 So. 323, 3 A.L.R. 1651 (Sup. Ct. 1919); Sheehan v. Tobin, 326 Mass. 185, 93 N.E.2d 524 (Sup. Jud. Ct. 1950); Kirkpatrick v. Eagle Lodge, 26 Kans. 384 (Sup. Ct. 1881).
In New Jersey it would seem that where a conditional privilege exists, it is not abused by the mere existence in the mind of the publisher of the motive of justified indignation against the plaintiff. Fahr v. Hayes, 50 N.J.L. 275, 279 (Sup. Ct. 1888). The most general form of statement in this state of the influence of the subjective upon the scope of the privilege is that it "is inconsistent with the existence of express malice and requires both an occasion of privilege and the use of that occasion in good faith." Finkelstein v. Geismar, 91 N.J.L. 46, 48 (Sup. Ct. 1917), affirmed 92 N.J.L. 251 (E. & A. 1918); Jorgensen v. Pennsylvania Railroad Co., 38 N.J. Super. 317, 345 (App. Div. 1955); Lawless v. Muller, 99 N.J.L. 9 (Sup. Ct. 1923). Express malice may be deduced by the jury from such circumstances as the use of language which exceeds the demands of the occasion, Savage v. Stover, 86 N.J.L. 478 (Sup. Ct. 1914), affirmed 87 N.J.L. 711 (E. & A. 1915), or which in terms is utterly beyond and disproportionate to the facts which the defendant had reason to believe, Finkelstein v. Geismar, supra (91 N.J.L., at p. 48), or from the circumstances under which the communication is made or from any extraneous facts which tend to prove it, Ibid. Where the motive of utterance is different from that *264 which prima facie rendered the communication privileged and is a motive contrary to good morals, the privilege vanishes, id.; Fahr v. Hayes, supra (50 N.J.L., at p. 279).
If we were to consider the criteria of malice discussed above as applicable here and the existence of malice in any such sense as determinative of defendants' liability, it would be apparent that the summary judgment under appeal is erroneous. While there is evidence from which a jury could conclude that defendants were motivated solely or primarily by the good of the order and the welfare of the chapters in District 7, there is other evidence from which it might be concluded that the activity of each of the defendants (other than Carroll) was actuated primarily or substantially by personal ill will, spite or prejudice, as to one or more of the plaintiffs, amounting to bad faith. We need not specify the proofs we have in mind. They are obvious from the recital hereinabove. They go to the establishment of operative facts which are subjective, and we think they would have to be submitted to a jury on the assumption stated. Judson v. Peoples Bank & Trust Co. of Westfield, supra (17 N.J., at p. 76); Jorgensen v. Pennsylvania Railroad Co., supra (38 N.J. Super., at p. 345).
We thus return to the crux of the case. Should the members of a strictly social or fraternal organization be held responsible in damages on the basis of the motives which actuate their concerted activity, within the confines of the organization, to exclude from membership those whom for any reason they deem objectionable? It is not without a search of conscience as well as for legal authorities that we have arrived at a negative conclusion upon the proposition posed. As already noted, we put to one side the matter of liability for defamation, not here presented. We also distinguish cases involving organizations, membership in which is an economic necessity: Carroll v. Local No. 269, International Brotherhood of Electrical Workers, 133 N.J. Eq. 144, 147 (Ch. 1943); Wilson v. Newspaper, etc. Union, 123 N.J. Eq. 347, 351 (Ch. 1938); Chafee, op. cit. supra (43 Harv. L. Rev., at p. 993); Comment, "Protection of Membership *265 in Voluntary Associations," 37 Yale L.J. 368, 371 (1928); or those which are repositories of civic, civil or political rights. Abernathy, "The Right of Association," 6 S. Car. L.Q., 32, 43, 44 (1953).
Plaintiffs stress the high value which the courts have attached to membership in fraternal societies, clubs and organizations, as evidenced by their readiness to redress unwarranted expulsion; and they imply that there should be equal readiness to protect against unwarranted interference with the opportunity for membership therein, just as against unjustified interference with prospective economic advantage. Cf. Longo v. Reilly, 35 N.J. Super. 405, 411, 412 (App. Div. 1955). There can be no doubt as to the conspicuous place of social and fraternal organizations in American society, Abernathy, op. cit. supra (6 S. Car. L.Q., at p. 33), nor as to the cachet attributed by almost every individual to membership in one or more particular voluntary associations, societies or groups, Comment, "Protection of Membership in Voluntary Associations," 37 Yale L.J. 368, 372 (1928); Annotation, 20 A.L.R.2d 344, 391. Professor Chafee has said that in comparison with "such emotional deprivations" as loss of membership in club, union, school or church, "mere losses of property often appear trivial," op. cit. supra (43 Harv. L. Rev., at p. 998). There is evidence that unwarranted obstruction of or interference with normal opportunities for social intercourse may be actionable. In Deon v. Kirby Lumber Co., 162 La. 671, 111 So. 55, 52 A.L.R. 1023 (Sup. Ct. 1926), it was held that the order of an employer to his employees not to patronize or visit the family of a local storekeeper gave rise to an action for damages. The charge in the complaint encompassed the malicious injury by the defendant of plaintiff's "social standing and character" and the effectuation of his ostracism. The court said: "The free and unhampered exercise of the right [to enjoy social relations with one's friends and neighbors] is necessary to his happiness, comfort and well-being. If he be unlawfully deprived of that right by others, he is entitled to redress." (111 So., at page 58); in accord, *266 Miller v. Monsen, 228 Minn. 400, 37 N.W.2d 543, 548, 549 (Sup. Ct. 1949).
We have no difficulty with the theoretical concept, expressed in various ways by modern jurisprudents, that intentional, willful or malicious harms of any kind are actionable unless justified. Prosser, op. cit. supra, § 108, pp. 760, 764, f.n. 36; Note, "The Prima Facie Tort Doctrine," 52 Col. L. Rev. 503 (1952); Cowan, "Torts," 10 Rutgers L. Rev. 115, 122 (1955); Mr. Justice Heher, in Louis Kamm, Inc. v. Flink, supra (113 N.J.L., at page 588). Nor can there be reasonable quarrel with the general idea that in assaying the range of interests requiring protection the law should recognize the "demand involved in social life in civilized society that all individuals shall have fair or reasonable * * * opportunities  political, physical, cultural, social and economic." Pound, "A Survey of Social Interests," 57 Harv. L. Rev. 1, 36 (1943); and see Green, "Relational Interests," 29 Ill. L. Rev. 460, 1041 (1934), 30 Ill. L. Rev. 1, 314 (1935), passim. The rub comes on the point of "justification." As particularly applied to the cause sub judice, it cannot be doubted that, in a sense, the intended consequence of defendants' actions was the exclusion of the plaintiffs from entry into the Order of the Eastern Star of New Jersey as a new chapter in the Seventh District. This may be conceded to have constituted the infliction upon plaintiffs of an injury in respect of an interest for which the law has concern. If maliciously done by a stranger to the order, there might well be an action. But in the case of the present defendants, was it not done "in the exercise of an equal or superior right," Louis Kamm, Inc. v. Flink, supra (113 N.J.L., at page 589), and therefore justifiable in a legal sense, whatever one's views as to the underlying social ethics?
Mr. Justice Holmes long ago illustrated the legal immunity of one exercising a primary right notwithstanding the incidental intent to inflict harm upon another:
"For instance, a man has a right to set up a shop in a small village which can support but one of the kind, although he expects *267 and intends to ruin a deserving widow who is established there already. He has a right to build a house upon his land in such a position as to spoil the view from a far more valuable house hard by." "Privilege, Malice and Intent," 8 Harv. L. Rev. 1, 3 (1894).
We have seen that voluntary associations generally have the unquestionable right to exclude from membership on any basis whatever. Fraternal association implies a degree of social intimacy but one step removed from that of the family. So long as this form of social organism remains as deeply embedded in our culture as it is now, the law must respect it and its ordinary concomitants, chief among which is selectivity of membership. Clearly to be implied from the absolutism over admission residing in the organization as an entity is the derivative right of individual members to be heard within the organization on their objections to an applicant and to persuade other members toward their views. To qualify that right by the peril of liability for punitive damages at the suit of an excluded applicant who can convince a jury that the objecting member was motivated by ill will, spite, or prejudice, would be, in our judgment, substantially to impair commonly accepted concepts as to freedom of selectivity in social and fraternal organizations, and, perhaps, in the long run, to foment and exacerbate rather than relieve the kinds of social stresses which lie beneath the present controversy. There is here apparent a clear "counter-policy" to the general policy of redressing the intentional infliction of harm. Cf. Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 564 (1955). Past unsavory experiences of a member with an applicant may be at once the source of ill will motivating the activity against admission and also a thoroughly justifiable reason for such activity. Other motives may be less justifiable but hardly capable of reliable segregation from good ones by a jury. We do not yet live in the age of the literal brotherhood of man. The "black-ball" continues to hold its place in our fraternal life. While courts may be expected continually to tug in the direction of a higher ethic, yet, absent legislation, they will wisely wait for new standards *268 of conduct to be invested "in the minds of the multitude with the sanction of moral obligation" before they invest them with the sanction of the law. Cf. Cardozo, "The Paradoxes of Legal Science" (1928), p. 18.
By throwing the issue of permanent acceptance of the proposed chapter open to debate and action upon the floor of an annual session of the Grand Chapter, after notice to each chapter in the district of the petition for dispensation, the constitution and by-laws of the order patently contemplated the possibility of a full debate and campaign on the issue among the membership in the democratic tradition, at least within the organization. There is no suggestion that the activities of the defendants were not confined within the order.
The only decided case we have found approaching the precise question here involved  liability in damages for malicious exclusion from membership in a fraternal organization  is Grand Lodge Order Hermann's Sons of Texas v. Schuetze, supra. In that case a local lodge of a fraternal organization was dissolved by the grand lodge at the request of the local because of what was regarded as an inexcusably false charge of theft by one of the members against another, and a new lodge was formed consisting of the same membership but excluding the offending member. The latter sued the grand lodge for conspiracy with its officers to deprive her of her membership. The case seems to us clearly to have been one, in effect, of expulsion rather than exclusion. But the appellate court reversed a judgment for plaintiff. After declaring that the dissolution was "legal" and that "when a legal right exists the law does not award damages on account of the motive which prompts its exercise" (83 S.W., at page 246), the court went on to say:
"It [grand lodge] had the legal right to sanction the disorganization of that lodge [subordinate lodge], and cannot be held liable for damages because its officers may have acted upon improper motives in accepting the dissolution of the local lodge * * *. It was the legal right of the members composing that body [new lodge], and of the grand lodge and its officers, not to invite her to its membership, regardless of the motives by which they were actuated; and the exercise of that right, upon whatever motive, did not fix *269 legal liability for damages against the grand lodge or any one else." (at p. 247)
The apparent absence of any other reported cases dealing with claims for damages for exclusion, as contrasted with the large number of cases involving damages for wrongful expulsion, is itself cogent evidence that such an action as is here laid is not generally deemed available, as the number of disappointed applicants for membership in fraternities, societies and private clubs of every kind, from town and eating clubs to country clubs, must be legion, and the range of motivation for exclusion kaleidoscopic.
We hold that what the defendants here did, in the aspect challenged by plaintiffs, was in the exercise of a primary right of the defendants; a right to act, individually and jointly, for the exclusion from the order of the proposed chapter for any reasons which they deemed warranted such action; and that in exercising such right their motives were immaterial.
There having been established no legal wrong attributable to defendants, the charge of conpiracy does not operate to sustain the claim, as "conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action." Louis Kamm, Inc. v. Flink, supra (113 N.J.L., at page 592); Judson v. Peoples Bank & Trust Co. of Westfield, supra (17 N.J., at page 82).

III.
Over and above the reasons for immunity set forth in II, supra, common to all the defendants, the defendant Anna Carroll is entitled to exculpation on the added ground that nothing has been shown even colorably to connect her causatively with plaintiffs' exclusion from the order.
This defendant, a member of a chapter in the Second District, at Hoboken, was present at the Grand Session in 1953 as Associate Grand Matron and became Most Worthy Grand Matron for the ensuing year at that session. It is undisputed that she had absolutely nothing to do with the *270 campaign carried on by the Seventh District chapters against Mercer Chapter prior to the Grand Session and in no way influenced the voting at the session. She was made a defendant solely because she issued "demits" to the members of Mercer Chapter subsequent to the Grand Session, an action which the record before us indicates the Grand Chapter ordered, on motion duly carried, at that session.
There is some question from the regulations of the order whether issuance of "demits" was appropriate in this situation. The constitution provides for two kinds of membership severance under the heading, "Withdrawal of Membership": (a) certificates of good standing, and (b) demits. The former are issued for the purpose of enabling a member to transfer from one chapter to another within three months. They do not operate to terminate membership. "Demission" is the withdrawal of a member from membership in a chapter. It attests the "voluntary withdrawal of a member in good standing." It will not issue unless the member is "clear on the books as to dues," etc., and free from charges. Grant of a demit terminates membership in the chapter and order. "Former members of suspended or extinct chapters" are "entitled to receive demits" from the Grand Chapter if their dues and assessments were paid at the time of suspension or revocation of their chapter. A demitted member has the right of affiliation in another chapter, if accepted thereby, without the requirement of initiation. It would appear that the Grand Chapter ordered the issuance of demits on the theory that the denial of the charter caused Mercer Chapter to become "extinct." Whether or not this was a correct construction of the regulations, there is nothing whatever presented which, in our judgment, could warrant a jury finding of wrongful conduct on the part of the defendant Carroll in carrying out as Grand Matron the order of the Grand Chapter. The factual situation in that regard being fully exposed, the defendant Carroll was entitled to summary judgment. Evans v. Rohrbach, 35 N.J. Super. 260, 268, 269 (App. Div. 1955).
Judgment affirmed.