990 P.2d 1061

**Herbert D. GOODMAN, M.D., Plaintiff–Appellant,**

v.

**SAMARITAN HEALTH SYSTEM, dba Maryvale Samaritan Hospital, Defendant–Appellee.**

**No. 1 CA–CV 97–0392.**

Court of Appeals of Arizona, Division 1, Department E.

March 16, 1999.

Review Denied Nov. 30, 1999.

Burch & Cracchiolo, P.A. by Bryan F. Murphy J., Brent Welker, Phoenix, Attorneys for Plaintiff–Appellant.

Lewis & Roca, LLP by Susan Freeman, Steve Labensky, Karen C. Owens,Phoenix, Attorneys for Defendant–Appellee.

Coppersmith & Gordon, P.L.C. by Andrew S. Gordon, Kristen B. Rosati, Phoenix, Attorneys for Amici Curiae.

## OPINION

SULT, Judge.

¶ 1 Herbert D. Goodman, M.D., sued Samaritan Health System, d/b/a Maryvale Samaritan Hospital, alleging claims of negligent peer review and malicious prosecution. The trial court granted summary judgment in favor of Samaritan, finding that Samaritan

was statutorily immune from these claims pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 36–445.02(B) (1993), the peer review immunity statute. Goodman now appeals that ruling. We granted permission to the Arizona Hospital and Healthcare Association and several other hospitals and medical centers to file a brief as Amici Curiae in favor of upholding the judgment. For the following reasons, we affirm the judgment.

## BACKGROUND

¶ 2 Samaritan's Medical Staff Bylaws provide that a new physician applying for staff privileges in the Family Practice Department shall be appointed to the provisional staff for a twelve-month period. During this time, the applicant must complete ten supervised cases, in which physicians selected by the applicant look at the medical charts of the applicant's patients to review his documentation of patient history, physical examination, and treatment provided. If the applicant fails to complete these supervised case reviews within one year, he may receive one twelve-month extension.

¶ 3 Once the provisional process is completed, the applicant may then apply for a promotion to the courtesy or permanent staff. As part of the courtesy staff application process, the applicant consents to an investigation of his medical portfolio, as well as other relevant information regarding prior patient care.

¶ 4 Goodman applied for medical staff privileges at Samaritan in 1989 and was appointed to provisional staff in March 1990. After receiving a one-year extension, Goodman completed his mandatory supervised case reviews in 1991. In January 1992, Goodman submitted an application for appointment to courtesy staff and the required investigation of his medical portfolio and background was undertaken by an appointed committee.

¶ 5 Following completion of the investigation, the committee expressed concerns that: (1) Goodman had falsified information regarding his prior affiliation with two area hospitals; (2) the Arizona Board of Medical Examiners ("BOMEX") had censured Goodman for "unprofessional conduct" for misdiagnosing a patient and knowingly falsifying that patient's medical records; and (3) the audit of Goodman's supervised case reviews reflected concerns about his patient care and documentation. Goodman submitted a response to these concerns in which he explained the circumstances of his BOMEX censure and his failure to mention prior hospital affiliations. Primarily though, Goodman's response sought to refute the finding that his supervised case reviews reflected inadequate patient care and documentation.

¶ 6 In reply, the committee admitted that the audit of the case reviews "did contain a couple of misstatements" and accordingly arranged for Dr. Donald Mulvaney, the Director of the Family Practice Residency program at another Samaritan medical center, to independently review Goodman's supervised case reviews. Dr. Mulvaney concluded that two of the eleven patient charts did not meet the community standard of care. Consequently, he recommended that Samaritan deny Goodman courtesy staff privileges.

¶ 7 Notwithstanding Dr. Mulvaney's recommendation, the committee recommended that Goodman be elevated from provisional staff to courtesy staff conditioned upon the following: (1) completion of a mini-residency of at least six weeks' duration; (2) performance of ten additional supervised cases within one year; and (3) continued nonparticipation in on-call emergency-room duty. Goodman then submitted additional documents responding to both the case review audit and Dr. Mulvaney's conclusions. Among these was a letter from a UCLA medical professor indicating that Goodman's documentation in his patients' charts showed "no deviation from the standard of medical care," and that many of the reviewers' comments were "grossly inaccurate." Goodman submitted similar letters from a University of Arizona pharmacology professor and two other physicians.

¶ 8 The committee then changed its conditions to the following: (1) retrospective review of his next ten admissions; (2) improved documentation of medical histories and physicals; and (3) improved management deci-

sions. Ultimately, in June 1993, Samaritan granted Goodman courtesy staff privileges on the sole condition that Goodman's next ten patients' charts be retrospectively reviewed. Goodman has since twice been reappointed to the courtesy staff, although Goodman has not yet satisfied this last condition. Goodman presently remains on courtesy staff.

¶ 9 In May 1994, Goodman filed a superior court complaint against Samaritan, alleging claims of negligent peer review and malicious prosecution and seeking damages consisting of attorneys' fees, expert witness fees, pain and suffering, and punitive damages. Samaritan moved for summary judgment, asserting that it was entitled to complete immunity pursuant to section 36–445.02(B). Goodman responded that the absolute immunity granted by this statute to peer review participants violated the anti-abrogation, due process, and privileges or immunities clauses of the Arizona Constitution. The trial court granted judgment for Samaritan on its immunity defense and dismissed all Goodman's claims. Goodman timely appealed.

### ISSUES

¶ 10 Goodman asserts that the trial court erred in holding that the absolute immunity provision of section 36–445.02(B), as applied to Goodman's claims for negligent peer review and malicious prosecution, does not violate the anti-abrogation, due process, or privileges or immunities clauses of the Arizona Constitution. Samaritan raises the issue whether the qualified immunity for professional review actions provided by the federal Health Care Quality Improvement Act immunizes Samaritan from liability. *See* 42 U.S.C. § 11101, *et seq.*

### ANALYSIS

#### I. Federal Immunity

 ¶ 11 It is sound judicial policy to avoid deciding a case on constitutional grounds if there are nonconstitutional grounds dispositive of the case. *See Petolicchio v. Santa Cruz County Fair & Rodeo*

*Association,* 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (1994). Both Samaritan and Amici assert this case can be resolved and the trial court affirmed by applying sections 11101 to 11115 of the Health Care Quality Improvement Act. 42 U.S.C. § 11101 *et seq.* (1994). Goodman argues that we should not address this issue because it was not presented to the trial court. Samaritan responds that although the trial court did not base its decision on the federal act, the issue was fairly and adequately presented below. Our review of the record leads us to conclude that Goodman is correct.

¶ 12 Samaritan first mentioned federal immunity in its reply to Goodman's response to Samaritan's separate motion to dismiss, a motion that is not part of this appeal. In that reply, Samaritan did discuss the purposes of federal immunity in the context of peer review proceedings. However, Samaritan did not provide any analysis to show that its conduct at issue here met the primary requirements for immunity imposed by the Act, namely that the conduct constituted a "professional review action" and met the four "safe harbor requirements." *See* 42 U.S.C. §§ 11151(9), 11112(a); *see also* Michael J. Baxter, *A Potent Weapon: Federal Peer Review Immunity Under HCQIA,* 64 Def. Couns. J. 364, 364–65 (1997). It is only when these requirements are met that statutory immunity attaches. *See* 42 U.S.C. § 11112(a).[1]

¶ 13 Samaritan's motion for summary judgment, which is the motion before us, stated merely that the Act provides protection similar to that provided by Arizona's statute, "immunizing peer review participants from liability so long as the medical staff follows procedures that meet minimal due process guidelines, which was done here." Again, no analysis tying the Act's provisions to the facts of this case was undertaken. On this state of the record, we conclude that the applicability of the Act was not properly before the trial court and is therefore not properly before us. *See Campbell v. Warren,* 151 Ariz. 207, 208, 726 P.2d 623, 624

---

1. Because we do not address this issue, we do not set forth the specific language of the applica-

ble provisions of the Health Care Quality Improvement Act.

(App.1986) ("arguments not made at the trial level cannot be asserted for the first time on appeal"). Consequently, we must address the constitutional issues raised by Goodman.

## II. Constitutionality of A.R.S. Section 36–445.02(B)

¶ 14 We begin by setting forth the pertinent language of the statute:

No hospital or outpatient surgical center and no individual involved in carrying out review or disciplinary duties or functions of a hospital or center pursuant to § 36–445 [mandated peer review] may be liable in damages to any person who is denied the privilege to practice in a hospital or center or whose privileges are suspended, limited or revoked. The only legal action which may be maintained by a licensed health care provider based on the performance or nonperformance of such duties and functions is an action for injunctive relief seeking to correct an erroneous decision or procedure.

In reviewing Goodman's challenge to the constitutionality of this statute, we accord the statute a presumption of constitutionality, with a view to resolving any doubts in favor of its validity. *Chevron Chemical Co. v. Superior Court*, 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982). In the face of this presumption, it is Goodman who bears the burden of proving unconstitutionality and that burden is one of proof beyond a reasonable doubt. *Hall v. A.N.R. Freight System, Inc.*, 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986).

### A. The Anti-abrogation Clause

¶ 15 Goodman first argues that the statute abrogates his right to recover damages in violation of article 18, § 6, of the Arizona Constitution, which provides:

The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

This provision serves the purpose of protecting the fundamental right to recover money damages pursuant to recognized common law tort causes of action. *Kenyon v. Hammer*, 142 Ariz. 69, 79–83, 688 P.2d 961, 971–75 (1984); *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 17, 730 P.2d 186, 194 (1986).[2]

¶ 16 According to Goodman, because he has alleged claims of negligence and malicious prosecution, both recognized common law tort remedies, he is entitled to a declaration that section 36–445.02(B) cannot constitutionally bar these claims. Samaritan disputes that Goodman's claims have a common law origin, arguing that there was no right at common law to obtain tort damages arising out of the peer review process. Samaritan asserts that the only remedy at common law was a limited due process right to seek injunctive relief, and therefore the legislature had the right to statutorily foreclose any damage remedy.

¶ 17 The anti-abrogation clause operates to preclude the legislature from abolishing a common law right of action for money damages that either existed as of statehood or judicially evolved into existence thereafter. *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 343–44, 861 P.2d 625, 628–29 (1993). This right to recover damages, considered fundamental in Arizona, has been "jealously protected by this court's jurisprudence from the first days of statehood." *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994). If a legislative enactment impinges upon a recognized right of action, it must be closely examined to determine if it merely regulates the bringing of the action or, in effect, abolishes it. See *Ruth v. Industrial Commission*, 107 Ariz. 572, 575, 490 P.2d 828, 831 (1971).

¶ 18 When an allegation of unconstitutional abrogation is raised, a necessary preliminary inquiry is whether the right of action asserted qualifies for protection under article 18, § 6. See *Evenstad v. State*, 178 Ariz. 578, 586, 875 P.2d 811, 819 (App.1993). That is, the right of action must be one that existed under our common law prior to the legislature's entry into the arena. *Id.* It is

---

**2.** Goodman also cites article 2, § 31 which similarly protects the recovery of damages. "No law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person." No separate analysis is necessary for this provision as it serves essentially the same purpose as article 18, § 6. *Kenyon*, 142 Ariz. at 79–83, 688 P.2d at 971–75.

not enough, as Goodman attempts here, to append to the asserted claim a name derived from the catalogue of common law actions. Rather, the context out of which the claim arises must be examined to determine whether it supports a conclusion that it implicates a right of action recognized by the common law. *Compare Hazine*, 176 Ariz. at 344, 861 P.2d at 629 (right to recover for injury from product recognized at common law, thus strict product liability claim is a cognizable common law claim even though concept of strict product liability unknown at statehood), *with Miel v. State Farm Mutual Automobile Insurance Co.*, 185 Ariz. 104, 111, 912 P.2d 1333, 1340 (App.1995)(dismissal of claim by insured against insurer for "negligent claims handling" affirmed over anti-abrogation objection because "no cause of action has ever been recognized for negligence in a case like this") *and Ramirez v. Health Partners of Southern Arizona*, 193 Ariz. 325, 334, 972 P.2d 658, 667 (App.1998) (finding no "common law action for negligence in the organ donation context").

¶ 19 The context with which we deal here is that of peer review of a health care provider that determines the provider's entitlement to work in a hospital setting. Statutorily mandated peer review, as we know it today, did not exist in Arizona until 1971 when the legislature first entered the field.[3] In that year, the legislature enacted A.R.S. section 36–431, which mandated peer review of physicians practicing in hospitals, and section 36–433, which provided immunity from liability for civil damages or any other legal action for decisions made by those participating in the process "without malice and in good faith."

¶ 20 The effect of section 36–433 was to create a claim for money damages in favor of a reviewee against a reviewer, including the

hospital, if it could be proved that the reviewer acted with malice and in bad faith in the peer review process. *See Scappatura v. Baptist Hospital of Phoenix*, 120 Ariz. 204, 210, 584 P.2d 1195, 1201 (App.1978). However, in 1984, the legislature amended the statute (by then renumbered to 36–445.02[4]) to remove any liability for any legal consequence, including money damages, for any individual or hospital involved in peer review activities, except for injunctive relief for an erroneous decision or procedure occurring during the process.[5] This is how the statute reads today, with other additions not relevant here.

 ¶ 21 If peer review were purely a creature of statute, we could conclude our inquiry here. It is well settled that if the legislature creates a right of action, it may circumscribe that right by denying or limiting damages for a violation of the statute. *See, e.g., Diaz v. Magma Copper Co.*, 190 Ariz. 544, 549, 950 P.2d 1165, 1170 (App.1997) (wrongful death statute). However, statutory peer review had a precursor in the nature of an informal, private peer review process that existed, at least in Maricopa County, before 1971. If the legislature in 1971 merely co-opted the private peer review process, added some refinements, and mandated what was being done voluntarily, it cannot be said that peer review was strictly a creation of the legislature.[6] We must therefore examine this informal peer review to determine whether a right of action for negligent or malicious peer review might have existed, or would have been created by the courts, before the legislature occupied the field.

¶ 22 Private peer review in the context of acceptance into a private medical society came under judicial scrutiny in *Blende v. Maricopa County Medical Society*, 96 Ariz.

---

**3.** *See* 1971 Sess. Laws ch. 203, § 1.

**4.** These sections were renumbered in 1976 to section 36–445 and section 36–445.02, respectively, their present designations. *See* 1976 Sess. Laws. ch. 1, §§ 15, 17.

**5.** *See* 1984 Sess. Laws ch. 119, § 1.

**6.** Legislative minutes from both the House and Senate subcommittees which considered the legislation do not enlighten us as to the origins of

the proposal. *See* Arizona State Senate, 1st. Legis. Sess., Public Health and Welfare Committee Notes (3/11/71); Judiciary Committee Notes (3/24/71). *See also* House of Representatives, Economic Affairs Committee Notes (April 1971); Health and Welfare Committee Notes (4/14/71); Judiciary, Suffrage, and Elections Committee Notes (4/15/71).

240, 393 P.2d 926 (1964). *Blende* dealt with membership in the Maricopa County Medical Society, a private association made up of physicians practicing in the county. In that case, appellant alleged that membership in the Society was a condition to practicing in any of the hospitals in the county, and that the Society denied him membership without just cause, thereby impairing his economic prospects. Appellant sought injunctive relief requiring the Society to admit him.

¶ 23 The *Blende* court took a cautious approach to involving itself in the affairs of a private association. The court took note of "the traditional view that medical societies and other voluntary associations have unlimited discretion to grant or refuse admission to membership." *Id.* at 243, 393 P.2d at 929. It then opined that

> [T]he scope of judicial review of the Society's action should be narrow. If the Society has refused membership on the basis of factual findings supported by substantial evidence and reached through the application of a reasonable standard—one which comports with the legitimate goals of the Society and the rights of the individual and the public—then judicial inquiry should end.

*Id.* at 244, 393 P.2d at 930. Notwithstanding this caution, the court did find that if membership in the Society was a condition of admittance to a hospital staff, and exclusion would affect the public's right to an unrestricted choice of physicians, then appellant had a right to have his application considered by the Society under proceedings "embodying the elements of due process." *Id.* at 245, 393 P.2d at 930.

¶ 24 There was no claim for damages mentioned in the *Blende* case, and it therefore does not stand as direct authority for the proposition that no right of action for damages existed, or would have been recognized, in the context of private peer review. What is instructive, however, is the "hands-off" attitude the court had toward the process of private peer review. It was only because that process might impact on a patient's right to choose his own physician that the court was even willing to become involved. Even then, the court was careful to note that a broad judicial inquiry was inappropriate, which at least implies that broadening the inquiry to reach an issue of damages would not have been countenanced.

¶ 25 *Blende* appears to be the only pre-1971 Arizona case dealing with this private form of peer review, and there appear to be no such cases dealing with money damages.[7] We do not find this necessarily dispositive, however, because in some other context we might find that well established common law principles would have supported a claim for damages, even though the particular context, or the claim asserted from that context, was unknown prior to its assertion. *See Hazine, supra; Humana Hospital Desert Valley v. Superior Court,* 154 Ariz. 396, 399, 742 P.2d 1382, 1385 (App.1987)(holding that art. 18, § 6 applied to negligent supervision claim even though the cause of action was not recognized until 1972). Nevertheless, in connection with malicious or negligent peer review as alleged by Goodman, we conclude that prior to 1971, no common law right of action for damages existed in Arizona.[8]

¶ 26 We reach this conclusion for two reasons. First, we presume, because neither Goodman nor our own research has shown otherwise, that the only type of peer review that existed pre-1971 was the informal type conducted by a private association as described in *Blende.* At the time *Blende* was decided, private associations had absolute discretion to exclude, unless membership was

<hr />

7. There are post-1971 cases arising under section 36-445.02 in which damages have been claimed. These cases are inapposite, however, since they arose under the statute when it still permitted a claim for damages if the reviewer acted with malice or in bad faith. *See, e.g. Gilbert v. Board of Medical Examiners,* 155 Ariz. 169, 745 P.2d 617 (App.1987); *Scappatura v. Baptist Hospital of Phoenix,* 120 Ariz. 204, 584 P.2d 1195 (App.1978).

8. As to malicious prosecution, one of Goodman's theories of recovery, it would seem impossible to have sued on this theory in the private peer review context. Such a claim requires a previous "action," either criminal or civil, to have been maliciously brought against the claimant. *See Frey v. Stoneman,* 150 Ariz. 106, 109, 722 P.2d 274, 277 (1986). Peer review proceedings conducted by a private association would not qualify as a civil or criminal action.

an "economic necessity" or the association had a business monopoly. *Blende*, 96 Ariz. at 244, 393 P.2d at 929. Even then, the only judicial encroachment permitted on this discretion was an injunction compelling the association to employ a procedure for exclusion that was consistent with due process and subject to a narrow judicial review. To have also permitted money damages for exclusion would have turned the then-existing jurisprudence regarding private associations on its head. *See e.g., Trautwein v. Harbourt*, 40 N.J.Super. 247, 123 A.2d 30, 37, *certification denied*, 22 N.J. 220, 125 A.2d 233 (1956) (in rejecting claim for money damages, court stated "[t]he general rule is that there is no legal remedy for exclusion of . . . an individual from admission into a voluntary association, no matter how arbitrary or unjust the exclusion"). *See also* R.D. Hursch, Annotation, *Right to Damages for Exclusion From Membership in Social or Fraternal Organization*, 59 A.L.R.2d 1290 (1958).

¶ 27 The second reason relates to the policy considerations justifying immunity from damages in the peer review context. Section 36–445, in requiring peer review, announces that it is for "the purposes of reducing morbidity and mortality and for the improvement of the care of patients provided in the institutions." That these are worthy goals cannot be gainsaid. However, militating against effective peer review is the fact that it "is not only time consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity. If lawsuits by unhappy reviewees can easily follow any decision . . . then the peer review demanded by A.R.S. § 36–445 will become an empty formality, if undertaken at all." *Scappatura*, 120 Ariz. at 210, 584 P.2d at 1201. If effective peer review is to be achieved, and the statutory goal realized, peer reviewers and their hospitals must have some protection against money damage claims.

¶ 28 The point to be made here is that the underlying justifications supporting statutory immunity were just as applicable in the private peer review context addressed in *Blende*. While physicians of that era no doubt organized into associations for some purely personal reasons, there was also a strong motivation to raise medical standards and practices to benefit the public. *See Pinsker v. Pacific Coast Society of Orthodontists*, 12 Cal.3d 541, 116 Cal.Rptr. 245, 526 P.2d 253, 267 (1974) ("Judicial authorities have made it clear that one perfectly legitimate objective of professional associations is to attempt to elevate professional standards in order to attain quality medical and dental care.") (citing *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791, 800 (1961), and *Salter v. New York State Psychological Association*, 14 N.Y.2d 100, 248 N.Y.S.2d 867, 198 N.E.2d 250 (1964)). Thus, we believe that had this type of action been filed in Arizona before 1971, the court would have concluded that immunity from money damages for participants in private peer review was required in order to advance the legitimate ends of elevating medical standards and protecting the public from inadequate physicians. And as is well settled, common law immunities do not contravene the anti-abrogation clause. *Ashton–Blair v. Merrill*, 187 Ariz. 315, 318, 928 P.2d 1244, 1247 (App.1996).

¶ 29 In summary, we conclude that with respect to peer review in connection with admittance to a hospital staff, no common law right of action for money damages either existed or would have been recognized in Arizona before 1971. Thus, the anti-abrogation clause does not apply to Goodman's claims because they are not of common law derivation. We therefore confirm the immunity granted to defendants by section 36–445.02(B) and hold that it applies to Goodman's claims.[9]

**B. Privileges or Immunities and Due Process Clauses**

¶ 30 Goodman's privileges or immunities argument is premised on the assertion that his right to sue in this context is a constitutional right derived from article 18,

---

9. Goodman did not assert a claim for defamation. We note that our analysis and holding are limited to the claims Goodman did present, namely negligence and malicious prosecution. A different analysis might be required if a defamation claim were made against an individual peer reviewer. *See Hazine, supra; Boswell, supra.*

§ 6. Thus, Goodman reasons, the court must strictly scrutinize section 36–445.02, as this is the level of scrutiny that must be applied to a statutory classification which results in a deprivation of a fundamental right, citing *Kenyon v. Hammer*, 142 Ariz. 69, 78–79, 688 P.2d 961, 970–71 (1984). Because there is no compelling state reason to grant immunity to peer reviewers, Goodman concludes, the statute violates article 2, § 13 of the Arizona Constitution, the "privileges or immunities" clause.[10]

¶ 31 Goodman's argument falters on its initial assumption because we hold in this opinion that Goodman has no fundamental right to sue in this context. When no fundamental right is at stake, we review a classification created by a statute under the rational basis test. *Evenstad v. State*, 178 Ariz. 578, 586, 875 P.2d 811, 819 (App.1993). That test requires that we uphold legislation if it serves a legitimate state interest and the legislative classification rationally furthers that interest. *Lerma v. Keck*, 186 Ariz. 228, 233, 921 P.2d 28, 33 (App.1996).

¶ 32 Extended analysis is not required to conclude that section 36–445.02 passes rational basis muster. Our previous discussion illustrates that the statutory goals of improving patient care and reducing hospital deaths are most certainly legitimate state interests. Mandated peer review by professionals knowledgeable in the medical field is a necessary and effective method of achieving these goals. Protection for reviewers in the form of statutory immunity from suits for money damages rationally promotes effective peer review and thus tends to accomplish what the statute seeks. Section 36–445.02 does not violate article 2, § 13, and we therefore reject Goodman's challenge.

¶ 33 Goodman's last argument is that section 36–445.02 violates article 2, § 4 of the Arizona Constitution, the due process clause. Goodman offers little analysis, arguing only the same flawed assertion that he has been deprived of a fundamental, constitutional right to sue. For the same reasons we re-

jected his other constitutional arguments, we likewise reject his due process argument.

## CONCLUSION

¶ 34 We affirm the judgment of the trial court.

CONCURRING: WILLIAM F. GARBARINO, Judge, and THOMAS C. KLEINSCHMIDT, Judge.

---

10. Goodman correctly notes that this clause serves essentially the same purpose as the Equal Protection Clause of the United States Constitution and that an allegation of violation of either clause is analyzed the same way. *Valley National Bank v. Glover*, 62 Ariz. 538, 554–55, 159 P.2d 292, 299–300 (1945).