**566**

672 P.2d 495

The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado corporation, Plaintiff-Appellee,

v.

ARIZONA CORPORATION COMMISSION and Jim Weeks, Bud Tims and John Ahearn, as members of the Arizona Corporation Commission, Defendants-Appellants.

No. 1 CA–CIV 5850.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 9, 1983.

Rehearing Denied Sept. 20, 1983.

Review Denied Nov. 22, 1983.

Fennemore, Craig, von Ammon, Udall & Powers, P.C. by Calvin H. Udall, George T. Cole, J. Gregory Osborne, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen. by Thomas P. Prose, Asst. Atty. Gen., Phoenix, for defendants-appellants.

## OPINION

KLEINSCHMIDT, Judge.

This case arises out of Mountain States Telephone & Telegraph Company's request for a rate change for the service area which encompasses Tucson. The change was disallowed by the Arizona Corporation Commission and Mountain Bell appealed to the superior court pursuant to A.R.S. § 40–254. The trial court granted summary judgment for Mountain Bell, from which the corporation commission appeals.

The commission claims that it is precluded from allowing the increase in rates for telephone service based on a schedule that allows an automatic rate increase when the number of telephones in the exchange increases beyond 200,000 without first holding a rate hearing. It rests its case upon the opinion of this court in *Scates v. Arizona Corporation Commission*, 118 Ariz. 531, 578 P.2d 612 (App.1978).

The facts are undisputed. In 1975 the commission conducted a rate hearing regarding the tariffs charged by Mountain Bell. The hearing lasted for 28 days. The commission considered Mountain Bell's rates and charges, rate base and rate of return. Thereafter, Mountain Bell was permitted to file revised tariffs with the commission.

Among other things the tariffs subsequently filed with the commission by Mountain Bell defined six "Exchange Rate Groups." The groups were determined by the number of telephone terminals served by the central offices of the exchanges. These revised tariffs also established charges for each rate group.

The method adopted permitted an automatic rate group reclassification allowing higher rates for those exchanges from which more phones can be reached without making a toll call. The rate changes were to be triggered when the number of telephones stabilized at over a given number. The rationale for this is that phone service increases in value as the number of toll free calls that can be made from a particular telephone increases. The corporation commission adopted the idea of automatic rate increases to ameliorate the effect of upgrading the rates for expanded exchanges at the same time a general rate increase was granted, a situation that had resulted in a particularly large rate increase. This order was incorporated into the revised tariffs filed by Mountain Bell and accepted by the commission.

When these revised tariffs became effective, the Tucson exchange was classified in Rate Group V and the services were billed accordingly. In October of 1979, Mountain Bell advised the commission that the size of the Tucson exchange had been steadily increasing. Mountain Bell submitted a revision to its Local Exchange Tariff reclassifying the Tucson exchange from Rate Group V to Rate Group VI, reflecting that the number of telephones in that exchange had stabilized at over 200,000.

## PROCEDURAL HISTORY AND THE TRIAL COURT'S ORDER

When Mountain Bell filed a proposed tariff revision with the commission in October, 1979, the commission, citing *Scates,* denied the proposed revision on the ground that it was without authority to allow the increase absent an interim or permanent rate hearing. In January, 1980, Mountain Bell filed an application for rehearing and it was denied by operation of law when the commission failed to take action on it.

The telephone company next appealed to the superior court from the commission's decision. Thereafter, the commission issued an order returnable before the commission directing Mountain Bell to show cause why its decision should not be affirmed. There

is almost nothing in the record regarding that hearing. The order by the commission which emanated from it shows that the evidence produced at that hearing reflected that the rate reclassification would result in an annual increase in the company's revenue of $2.4 million. No evidence was introduced to show how that increase would affect the rate of return Mountain Bell was then receiving.

The superior court granted Mountain Bell's motion for summary judgment and denied the commission's cross-motion. It concluded that the company was not seeking a rate increase of the type that was the subject of *Scates* because the company was providing increased, and therefore more valuable, service. It reasoned that since the increasingly more valuable service was mandated, it was no different than exacting a charge for putting more phones in a house. The trial court observed that the graduated schedule that is automatically triggered when service improves beyond certain pre-set points is a "kind of non-traditional or non-enunciated but generally accepted automatic adjustment understanding." It concluded that *Scates* does not apply to the precise fact situation that this case presents and suggested that if the revenue growth from the automatic adjustment is beyond that which reflects a fair rate of return, the *commission* has the right to call for a full or partial hearing. Finally, the trial court concluded that the commission's denial of the increase on the grounds that *Scates* forbade the increase without first having a hearing as a matter of law constituted a denial of due process of law.

The minute order reflects the care that the trial judge took in arriving at his conclusions. We can agree with many of the points made in that order but we disagree with the trial court's ultimate conclusion.

## THE NECESSITY FOR A HEARING

We begin our analysis by stating our conclusion. Rate increases based upon a schedule that allows for automatic changes that turn upon an increase in the value of the services provided may not be given ef-

fect unless the commission determines, after hearing, that such increase is just and reasonable. That determination must be based upon a consideration of whether the company is receiving a fair rate of return on its investment which in turn requires a consideration of the "fair value" of the company's property. We cannot assay, on this record, what such a hearing must entail.

We find two faults with the trial court's ruling:

First: It places the burden on the corporation commission to call for a hearing if it believes the increase in revenue would affect the fair rate of return the company receives. We believe the Ariz. Const. art. XV, § 14 and *Scates require* a hearing.

Second: We cannot say, on this record, that the hearing pursuant to the commission's order to show cause was a denial of due process. We simply do not know what went on in that hearing.

The body of law dealing with the commission's duty to set rates based on a fair rate of return on a utility company's investment is set forth in detail in *Scates*. We will not repeat it except to state that it is predicated on succeeding interpretations of the Ariz. Const. art. XV, §§ 3, 14, and the

statutes which were enacted to carry out those provisions.

We do agree with Mountain Bell and the trial court that *Scates* does not deal with the precise fact situation presented here. We must decide whether a revenue increase automatically triggered by a pre-set increase in the value of services is a rate increase within the meaning of A.R.S. § 40–250.[1] We think that it is.

It is undisputed that the change will result in a substantial increase in the company's revenue. The argument that the change is no different than the increased revenue the company enjoys from the installation of additional telephones is an imperfect one. The benefit to the subscriber derived from his ability to reach more telephones without making a toll call seems less tangible and may be less susceptible of measurement than is the benefit conferred by something like the installation of a telephone requested by a customer who knows precisely what he is getting and precisely what it will cost at the time he orders it. Presumably, it is also easier to measure the cost of increasing a service like the addition of one telephone against the increased revenue from providing such a service than it is to measure the cost to the company of providing a larger exchange against the increased revenue derived from the auto-

1. § 40–250. Hearing on rate or other change in operations by public service corporation; establishment of rates or other practices by order of commission

A. No public service corporation shall raise any rate, fare, toll, rental or charge, or alter any classification, contract, practice, rule or regulation to result in any increase thereof, except upon a showing before the commission and a finding by the commission that an increase is justified. The showing before the commission by a public service corporation with gross operating revenues of less than twenty-five thousand dollars, including the requested rate relief, may be made with or without a hearing as determined by order of the commission.

B. When there is filed with the commission any schedule stating an individual or joint rate, fare, toll, rental, charge, classification, contract, practice, rule or regulation not increasing or resulting in an increase, the commission may, without answer or other pleadings by the interested corporation, but

upon reasonable notice, conduct a hearing concerning the propriety of the rate, fare, toll, rental, charge, classification, contract, practice, rule or regulation, and pending the hearing and the decision thereon, it shall not go into effect. The period of suspension thereof shall not extend one hundred twenty days beyond the time when it would otherwise go into effect, unless the commission extends the period of suspension for a further period not exceeding six months.

C. On the hearing the commission shall by order establish the rates, fare, tolls, rentals, charges, classifications, contracts, practices, rules or regulations proposed, in whole or in part, or establish others in lieu thereof, which it finds just and reasonable, and which, if not suspended shall, on the expiration of thirty days from the time of filing the order, or in such lesser time as the commission grants, become effective and be established, subject to the power of the commission to alter or modify the order.

matic increase in rates when the number of phones increases beyond a given point.

*Scates* recognizes two exceptions to the rule that rate increases must be preceded by a hearing to determine the impact of such on the fair rate of return. One of these is the interim rate increase which allows the utility, on an emergency basis, to charge a higher rate between the time there has been a determination that an existing rate is confiscatory and the time a new rate is established. The other is the automatic adjustment clause, a device that allows a rate "to adjust automatically, either up or down in relation to fluctuations in certain, narrowly defined, operating expenses." 118 Ariz. at 535, 578 P.2d at 616.

Neither of these exceptions fits the situation presented by this case. This is not an emergency situation, and there has been no determination that a failure to impose the increased rate is confiscatory. There has been no suggestion that a bond be posted guaranteeing a refund in the event the increased rate is unjustified. The increase is unlike an automatic adjustment clause because it is not tied to fluctuations in cost and there is no reason to think, at least on this record, that the new rate will not increase the company's net revenue.

As we have already observed, we are not able to define, from this record, how extensive the rate hearing must be or what form the evidence must take. *Scates,* by dicta, leaves room for something less than a full or permanent rate hearing of the most complex type. There is absolutely nothing in the record to guide us on this point but we strongly suspect that, given the experience and expertise of counsel, the company and the commission, a meaningful review can be conducted efficiently.[2]

Mountain Bell argues that if the rate increase for the Tucson exchange is not allowed that the different rates prevailing in Tucson and Phoenix, both of which exchanges now have over 200,000 telephones, will constitute an impermissible discrimination between similarly situated telephone customers. This, it says, will amount to a violation of art. 15, § 12 of the Arizona Constitution, which prohibits discriminatory charges, and of A.R.S. § 40–334(A), which forbids a public service corporation from giving preferences. This may be correct but it does not inexorably mandate the increase the company seeks. Since the commission has not denied the increase any opinion of ours on the point would be an advisory one. We think it best not to venture into this area on this abbreviated record, especially since the briefs of both parties discuss the point in a cursory manner.

Finally, we do not wish to be understood to reject the principle of graduated rates based on the value of service provided. Presumably the varying rates adopted when the commission decided to allow automatic rate increases based on an increase in the service provided were in turn based upon a consideration of a fair rate of return. In a perfectly static economy the full rate hearing held in 1975 would suffice. The economy, of course, is not static. We simply hold that the increase triggered by a determination that value of telephone service has increased at any given point when the phones in an exchange exceed a certain number cannot be fully automatic.

The order granting summary judgment in favor of Mountain States Telephone and Telegraph Company is reversed.

It is further ordered remanding this cause to the superior court with direction to enter summary judgment for the Arizona Corporation Commission. The telephone company may thereupon apply to the commission for rate increase and the commission may proceed to hear the matter.

CORCORAN and CONTRERAS, JJ., concur.

---

2. In *Scates* the company was prepared to offer summary data, based upon prior submissions to the commission, showing the effect of the proposed increase on its rate of return. It was the commission's rejection of the offer that this court condemned.