20 P.3d 1169

**RESIDENTIAL UTILITY CONSUMER OFFICE, an agency of the State of Arizona, Appellant,**

v.

**The ARIZONA CORPORATION COMMISSION, an agency of the State of Arizona, Appellee,**

and

**Rio Verde Utilities, Inc., Appellee–Intervenor.**

No. 1 CA–CC 99–0008.

Court of Appeals of Arizona, Division 1, Department E.

March 27, 2001.

Residential Utility Consumer Office by Scott S. Wakefield and Jessica Carpenter, Phoenix, Attorneys for Appellant.

Arizona Corporation Commission by Robert J. Metli and Janet F. Wagner, Phoenix, Attorneys for Appellee.

Sallquist & Drummond, P.C. by Richard L. Sallquist, Phoenix, Attorneys for Intervenor Rio Verde Utilities, Inc.

Fennemore Craig by Norman D. James and Jay L. Shapiro, Phoenix, Attorneys for Amicus Curiae Water Utilities Association of Arizona.

## OPINION

GARBARINO, Presiding Judge.

¶1 We hold that in the absence of an emergency or automatic adjustment clause, the Arizona Corporation Commission cannot impose a rate surcharge based on a specific cost increase without first determining a utility's fair value rate base.

### FACTUAL AND PROCEDURAL HISTORY

¶2 In July 1999, Rio Verde Utilities, Inc. filed an application with the Arizona Corporation Commission (the Commission), pursuant to Senate Bill 1252,[1] seeking authorization to impose a surcharge to recover increases in the cost of water purchased from the Central Arizona Project (CAP). The documentation submitted in support of the application reflected that the amount of CAP water delivered to customers and the cost per thousand gallons had both increased since Rio Verde's last rate case in 1994.

¶3 The Commission staff reviewed and analyzed the data supplied to them by Rio Verde. The staff recommended that the Commission reject the surcharge application and conduct a full rate hearing to consider the changes in Rio Verde's rate base, operating expenses, revenue, and other relevant

---

1. The portion of S.B. 1252 that Rio Verde relied upon in making its application became effective in 1997 and was codified at Arizona Revised Statutes (A.R.S.) section 40–370 (Supp.1999). *See* 1997 Ariz.Sess.Laws, ch. 202, § 1.

factors.[2] Before the staff filed its recommendation to deny the application, the Residential Utility Consumer Office (RUCO)[3] filed an application to intervene. The Commission granted RUCO's unopposed application at an open meeting held on October 26, 1999, before the Commission's vote on Rio Verde's surcharge application.

¶ 4 On November 2, 1999, the Commission issued Decision No. 62037, approving Rio Verde's surcharge application by a two-to-one vote. In its Findings of Fact, the Commission found that Rio Verde's 1998 rate of return of 4.15% was less than its authorized rate of return of 8.62%, but that Rio Verde had not demonstrated that the deterioration in its rate of return was caused by the increase in its CAP water expenses. The Commission also found that Rio Verde's operations had changed significantly since its last rate case, citing a 49% increase in customers, a 300% increase in rate base, and a 57% increase in revenues from water operations. The Commission concluded that these factors could affect rates and should be analyzed during a full rate hearing. The Commission ordered Rio Verde to file a rate application within six months and granted Rio Verde's surcharge request subject to "true-up" during the ordered forthcoming full rate hearing.

¶ 5 RUCO filed an application for rehearing, which was denied by operation of law. *See* A.R.S. § 40–253(A) (1996) (stating that an application for rehearing is deemed denied if the Commission fails to grant the application within twenty days). RUCO timely filed this appeal. Rio Verde filed a motion with this Court seeking permission to intervene in support of the Commission, which we granted. We exercise jurisdiction pursuant to A.R.S. section 40–254.01(A) (1996).

## ISSUES PRESENTED

¶ 6 RUCO raises the following three issues in this appeal:

1. Whether Rio Verde violated the express notice provision of A.R.S. section 40–370(C) (Supp.2000);

2. Whether the Commission exceeded its constitutional rate-making authority by approving a surcharge without first conducting a fair valuation of Rio Verde property and determining Rio Verde's rate base; and

3. Whether A.R.S. section 40–370(C) is an unconstitutional encroachment upon the Commission's plenary rate-making authority.

¶ 7 We reach the question whether a statute is constitutional only when it is necessary to do so to decide the case. *R.L. Augustine Constr. Co. v. Peoria Unified Sch. Dist. No. 11,* 188 Ariz. 368, 370, 936 P.2d 554, 556 (1997); *Comeau v. Arizona State Bd. of Dental Exam'rs,* 196 Ariz. 102, 108, ¶ 31, 993 P.2d 1066, 1072 (App.1999); *Goodman v. Samaritan Health Sys.,* 195 Ariz. 502, 505, ¶ 11, 990 P.2d 1061, 1064 (App.1999) ("It is sound judicial policy to avoid deciding a case on constitutional grounds if there are nonconstitutional grounds dispositive of the case.").

¶ 8 Because we conclude that the Commission exceeded its authority by approving Rio Verde's request for a surcharge based upon the current state of the law, we need not resolve the constitutionality of A.R.S. section 40–370(C). In so doing, we accept the Commission's argument that its decision to approve the surcharge was based on its constitutionally sanctioned plenary power to prescribe rates, rather than on the statute. We also decline to decide whether notice was proper under the statute. We will only

---

2. A full rate hearing is the process by which the Commission undertakes to determine the fair value of a utility's property when establishing rates. We express no opinion on the methods and formulas that the Commission should use in arriving at a fair value. *See Arizona Corp. Comm'n v. Ariz. Water Co.,* 85 Ariz. 198, 202, 335 P.2d 412, 414 (1959); *Simms v. Round Valley Light & Power Co.,* 80 Ariz. 145, 154–55, 294 P.2d 378, 384 (1956). We do, however, recog-

nize that this valuation is constitutionally mandated. Ariz. Const. art. 15, § 14.

3. RUCO is a state agency charged with representing the interests of residential utility consumers in regulatory proceedings before the Commission. *See* A.R.S. § 40–461 to –464 (1996). RUCO is authorized by statute to intervene and participate in such proceedings as a party in interest. *See* A.R.S. § 40–464(A)(2).

address the reasons we believe the Commission exceeded its constitutional rate-making authority when it authorized the surcharge at issue.

## STANDARD OF REVIEW

▉ ¶ 9 We will not disturb an order of the Commission unless the party seeking review makes a clear and convincing showing that the Commission's actions were unlawful or unreasonable. *Tucson Elec. Power Co. v. Arizona Corp. Comm'n*, 132 Ariz. 240, 243, 645 P.2d 231, 234 (1982); A.R.S. § 40-254.01(E) (1996).

## DISCUSSION

▉ ¶ 10 The Commission is established by Article 15, Section 1 of the Arizona Constitution. The Commission's authority is derived from Article 15, Section 3, which provides, in pertinent part, that the Commission "shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein." Ariz. Const. art. 15, § 3. When setting rates for public utilities, the Commission should focus on the principle that "total revenue, including income from rates and charges, should be sufficient to meet a utility's operating costs and to give the utility and its stockholders a reasonable rate of return on the utility's investment." *Scates v. Arizona Corp. Comm'n*, 118 Ariz. 531, 533–34, 578 P.2d 612, 614–15 (App.1978).

▉ ¶ 11 Although the Commission's authority to prescribe rates is plenary, *Tucson Elec. Power Co.*, 132 Ariz. at 242, 645 P.2d at 233, the Commission's rate-making authority is subject to the "just and reasonable" clauses of Article 15, Section 3 of the Arizona Constitution. Under most circumstances, the Commission is constitutionally obligated

> to find the fair value of the [utility's] property and use such finding as a rate base for the purpose of calculating what are *just and reasonable* rates.... While our constitution does not establish a formula for arriving at fair value, it does require such value to be found and used as the base in fixing rates. *The reasonableness and justness of the rates must be related to this finding of fair value.*

*Simms*, 80 Ariz. at 151, 294 P.2d at 382 (emphasis added); *see also Arizona Corp. Comm'n v. Ariz. Pub. Serv. Co.*, 113 Ariz. 368, 370, 555 P.2d 326, 328 (1976); Ariz. Const. art. 15, § 14. In limited circumstances, the Commission may engage in rate making without ascertaining a utility's rate base. The Commission can exercise its authority when rates are predicated on an interim basis or when the rate changes are pursuant to an automatic adjustment clause.

¶ 12 Relying on the supreme court's decision in *Arizona Corporation Commission v. Mountain States Telephone & Telegraph Co.*, 71 Ariz. 404, 228 P.2d 749 (1951), the Arizona Attorney General acknowledged that the superior court has the authority to order a temporary rate increase without a full rate hearing. Op. Att'y Gen. 71–17 at 10. The Attorney General reasoned that the Commission itself could approve rate increases without first determining the fair value of the utility's property, but "only upon a finding that an emergency exists." *Id. Scates* follows the Attorney General's conclusion that, while the Commission has broad authority when setting rates, the interim rate-making authority is limited to circumstances in which (1) an emergency exists; (2) a bond is posted by the utility guaranteeing a refund to customers if the interim rates paid are higher than the final rates determined by the Commission; and (3) the Commission undertakes to determine final rates after a valuation of the utility's property. 118 Ariz. at 535, 578 P.2d at 616 (following the conclusion drawn in Op. Att'y Gen 71–17).

¶ 13 In addition, rates may also be increased following the establishment of a permanent rate structure through the operation of an automatic adjustment clause. An automatic adjustment clause is generally established by the Commission as a part of a utility's overall rate structure. It is usually established during a full rate hearing to allow a utility to increase or decrease rates automatically "in relation to fluctuations in certain, narrowly defined, operating expenses." *Id.* Automatic adjustment clauses are de-

signed to ensure that utilities maintain a relatively constant profit despite an increase in a specific cost anticipated by the adjustment clause. An automatic increase allows a utility to recoup cost increases by passing the costs on to the customer, while at the same time maintaining the utility's net income. *Id.* The same is true in the converse situation, that of an automatic decrease. The decrease in cost is passed on to the customer without disturbing a utility's profit. In essence, an automatic adjustment clause is designed to offset cost increases or decreases, leaving the utility's ultimate net income unchanged.

¶ 14 With these basics in mind, we now address the parties' respective arguments relating to the classification of the surcharge at issue in this case as either an interim rate increase or as an increased rate based on an automatic adjustment clause.

I. *Interim Rates*

■ ¶ 15 The Commission does not contend that the increase in the CAP water expense constituted an emergency justifying an interim rate increase. Rather, the Commission argues that its power to set interim rates is not limited to emergency situations. The Commission relies on *Pueblo Del Sol Water Co. v. Arizona Corporation Commission,* 160 Ariz. 285, 772 P.2d 1138 (App.1988), in support of its contention. The Commission further argues that *Scates* should be interpreted liberally rather than restrictively.

¶ 16 *Pueblo Del Sol* involved the sale of substantially all of one utility's assets to another utility. The selling utility had been authorized to charge a higher rate to its customers than had the buying utility. The buying utility sought and received the Commission's approval to continue charging the higher rate to the selling utility's customers. Although depicted as an "interim rate," the rate that was being charged by the selling utility was a final rate set by the Commission for that particular company. *Id.* at 286–87, 772 P.2d at 1139–40. We do not believe *Pueblo Del Sol* to be an "interim rate" case as contemplated by *Scates* . The Commission's approval in *Pueblo Del Sol* was, in effect, an approval of the continued use of a previously authorized rate.

■ ¶ 17 When discussing interim rates, the *Pueblo Del Sol* court restated the test set forth in *Scates* in the disjunctive. The court defined interim rates as "rates charged by the utility for services or products pending the establishment of a permanent rate, in emergency situations, *or* where a bond is posted that guarantees a refund to consumers for any excess paid by them prior to the Commission's final determination." *Id.* at 287, 772 P.2d at 1140 (emphasis added). Although we agree with the result reached in *Pueblo Del Sol,* we believe that the court misstated the test set forth in *Scates.* We agree with the *Scates* court's approval of the circumstances in which interim rates may be considered and approved by the Commission. Clearly, *Scates* contemplated, and we agree, that interim rate making requires all three elements—an emergency situation, the posting of a bond, and a subsequent full rate case—in order to comport with the constitutional mandate that rates be just and reasonable.

¶ 18 Nothing in the record indicates that the increase in CAP water expense rose to the level of an emergency situation, thereby making Rio Verde eligible for an interim rate. Although the surcharge at issue was subject to a "true-up" after a determination of final rates, the record does not reflect that Rio Verde posted a bond. In addition, the record does not indicate that Rio Verde and the Commission have undertaken a full rate hearing. Hence, the surcharge at issue did not qualify as an interim rate within the meaning of *Scates.*

II. *Automatic Adjustment*

■ ¶ 19 The Commission also argues that the surcharge can be fairly classified as an automatic adjustment because "[n]o case law exists requiring an automatic adjustment clause to be established in a full rate case." RUCO argues that *Scates* requires an automatic adjustment clause to be established after a full rate hearing. It is clear that *Scates* envisions the automatic adjustment clause as part of the utility's overall rate structure, which can be set only after a full rate hearing. *See Scates,* 118 Ariz. at 535,

578 P.2d at 616 ("Such clauses usually embody a formula *established during a rate hearing* .... ") (emphasis added); *id.* ("When courts have upheld such automatic adjustment provisions, they have generally done so because *the clauses are initially adopted as part of the utility's rate structure* in accordance with all statutory and constitutional requirements ....") (emphasis added).

¶ 20 The surcharge in this case is not the product of an automatic adjustment clause that existed before Rio Verde filed its application for a surcharge, nor does the record reflect the existence of an automatic adjustment clause. We agree with the court in *Scates,* and we acknowledge our concern for "piecemeal" rate making as being "fraught with potential abuse." *Id.* at 534, 578 P.2d at 615.

¶ 21 Here, the Commission argues that the surcharge at issue can be fairly classified as an automatic adjustment, with no showing that an automatic adjustment was ever contemplated or that a clause was ever approved. The Commission appears to argue that it can *sua sponte* declare a rate increase based on an increase in the cost to a utility of a specific operating expense under the guise of an automatic adjustment without there having been consideration or approval of an automatic adjustment clause. Such an *ipse dixit* approach not only offends the *Scates* court's concerns about piecemeal rate making, but it also offends the constitutional mandate that rates be fair and reasonable and made in the context of a fair valuation of all of a utility's assets. *See* Ariz. Const. art. 15, § 3. If ever there was a situation "fraught with potential abuse," *Scates,* 118 Ariz. at 534, 578 P.2d at 615, it occurs when the Commission of its own volition has the ability to declare any rate increase an "automatic adjustment." Indeed, the Attorney General in Opinion 71–15 noted that, at the very least, a mode of establishing an automatic adjustment clause must meet minimum standards of due process. *See* Op. Att'y Gen. 71–15 at 7. Having the ability to characterize a surcharge as an automatic adjustment without prior approval fails to meet those minimum standards of due process.

¶ 22 A public utility is entitled to due process when a ratemaking body undertakes to calculate a reasonable return for the use of its property and services by the public. *See Simms,* 80 Ariz. at 149, 294 P.2d at 380 (citing *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898)). Conversely, the public is entitled to the same level of protection when the government seeks to increase the utility rates that the public is obligated to pay.

## CONCLUSION

¶ 23 We find by clear and convincing evidence a showing that the Commission, in approving Rio Verde's application for a surcharge, disregarded the safeguards set forth by *Scates* that there be an emergency and a bond, and that the interim rate be in contemplation of a full rate hearing to "true-up" the rate. We also find that the surcharge at issue in this case does not qualify as an automatic adjustment. For the foregoing reasons, we set aside the order of the Commission, and we remand this matter to the Commission for further proceedings consistent with this opinion.

CONCURRING: RUDOLPH J. GERBER, Judge, REBECCA WHITE BERCH, Judge.