IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

RESIDENTIAL UTILITY CONSUMER OFFICE, an agency of the State of Arizona, *Appellant*,

*v.*

THE ARIZONA CORPORATION COMMISSION, *Appellee*.

ARIZONA WATER COMPANY, *Intervenor*.

No. 1 CA-CC 13-0002
1 CA-CC 14-0001
(Consolidated)

FILED 8-18-2015

Arizona Corporation Commission
No.  W-01445A-11-0310
W-01445A-12-0348

**AFFIRMED IN PART; VACATED IN PART**

COUNSEL

Ridenour Hienton, P.L.L.C., Phoenix
By Scott S. Wakefield
*Co-Counsel for Appellant*

Residential Utility Consumer Office, Phoenix
By Daniel W. Pozefsky
*Co-Counsel for Appellant*

Arizona Corporation Commission, Legal Division, Phoenix
By Janice M. Alward, Wesley C. Van Cleve, Charles H. Hains, Bridget A. Humphrey
*Counsel for Appellee Arizona Corporation Commission*

Bryan Cave, L.L.P., Phoenix
By Steven A. Hirsch, Rodney W. Ott
*Counsel for Intervenor Arizona Water Company*

---

**OPINION**

Presiding Judge Margaret H. Downie delivered the Opinion of the Court, in which Judge Kenton D. Jones and Judge Jon W. Thompson joined.

---

D O W N I E, Judge:

¶1        The Residential Utility Consumer Office ("RUCO") appeals two decisions by the Arizona Corporation Commission ("Commission") that adopted a system improvement benefits ("SIB") mechanism permitting Arizona Water Company ("AWC") to collect surcharges from utility customers in between rate cases for defined capital expenditures. Because we conclude the SIB mechanism does not comply with the Arizona Constitution's mandate that the Commission determine a public service corporation's fair value when setting rates, we vacate the approval of that rate-making device. However, we affirm the Commission's determination of the appropriate return on equity.

**FACTS AND PROCEDURAL HISTORY**

**I.        The Parties**

¶2        The Commission is a constitutionally created entity that, among other things, regulates the rates charged by public service corporations. *See* Ariz. Const. art. 15, §§ 2-3. AWC — a privately held for-profit corporation — is a monopoly water utility whose rates are set by the Commission; AWC provides water service to nineteen separate systems in Arizona. RUCO is a state agency established to represent the interests of residential utility consumers in Commission proceedings. *See* A.R.S. § 40-462.

## II.    Eastern Group Case

¶3        In August 2011, AWC filed an application with the Commission to increase rates for its eastern group water systems ("Eastern Group Case").  As relevant here, AWC requested: (1) a return on equity ("ROE") of 12.5%[1] and (2) a distribution system improvements charge ("DSIC") that would permit AWC to recover, in between rate cases, certain capital costs for improvement projects related to its distribution system and aging infrastructure. RUCO intervened in the Commission proceedings.

¶4        An administrative law judge ("ALJ") held a multi-day hearing on AWC's application.  Commission staff ("Staff") and RUCO both opposed the proposed DSIC.  Staff expressed concern that it would alter "the balance of ratemaking lag by reducing lag time for recovery of depreciation and return on plant investments, to the benefit of AWC and the detriment of its ratepayers," and Staff also argued "that allowing recovery of capital improvement costs between regular rate cases results in less scrutiny of plant investments both as to prudency and the used and usefulness of the plant."   In the alternative, Staff recommended several conditions that should apply to any DSIC-type mechanism the Commission might ultimately approve.

¶5        The ALJ recommended that the Commission set the ROE at 10.55% and that it deny the requested DSIC. After considering the ALJ's written opinion and recommendations, the Commission approved a rate increase for AWC, setting the ROE at 10.55%.  The Commission remanded the DSIC issue "to allow the parties the opportunity to enter into discussions regarding AWC's DSIC proposal and other DSIC like proposals."

¶6        All parties except RUCO subsequently entered into a settlement agreement in the Eastern Group Case ("Eastern Group Settlement Agreement").  That agreement included a modified version of the DSIC, now called a SIB.

¶7        An ALJ conducted a hearing regarding the Eastern Group Settlement Agreement, with RUCO opposing its approval. With some

---

[1]       As we discuss *infra*, ¶ 53, the ROE is intended to provide AWC with a fair rate of return on the value of property it employs for public service.

suggested modifications, the ALJ recommended that the Commission approve the Eastern Group Settlement Agreement, including the SIB mechanism, but also recommended that the ROE be reduced from 10.55% to 10.00%.

¶8 The Commission adopted most of the ALJ's recommendations regarding the Eastern Group Settlement Agreement, but, by majority vote, maintained the ROE at the previously approved level of 10.55%.[2] The Commission also required AWC to provide more documentation with its surcharge applications than the settlement agreement contemplated. RUCO filed an application for rehearing. After further evidentiary proceedings, the ALJ again concluded the SIB was appropriate and again recommended the Commission reduce the ROE to 10.00%.

¶9 In its final decision, by a 3-2 vote, the Commission approved the SIB mechanism and maintained the ROE at 10.55%. RUCO filed a timely notice of appeal.

## III.    Northern Group Case

¶10 In August 2012, AWC filed an application with the Commission seeking rate increases for its northern group water systems ("Northern Group Case"). AWC's application included a DSIC proposal similar to that requested in the Eastern Group Case. RUCO intervened in the Northern Group Case as well.

¶11 All parties except RUCO entered into a settlement agreement in April 2013 ("Northern Group Settlement Agreement"). The agreement incorporated the SIB determination from the Eastern Group Case. After an evidentiary hearing, an ALJ recommended that the Commission approve the Northern Group Settlement Agreement.

¶12 The Commission adopted the ALJ's proposed order. However, it made the agreed-upon SIB mechanism "subject to additional modifications that may be made by the Commission" in the Eastern Group Case. RUCO filed an application for rehearing, but its request was denied by operation of law pursuant to A.R.S. § 40-253(A) ("If the

---

[2]    Commissioner Brenda Burns dissented, stating that "AWC ratepayers should not be asked to pay for an elevated ROE while also being the test case for a newly approved SIB."

commission does not grant the application [for rehearing] within twenty days, it is deemed denied.").

¶13 RUCO filed a timely notice of appeal. By stipulation of the parties, we consolidated the Eastern Group and Northern Group cases for purposes of appeal. We also granted AWC's motion to intervene. This Court has jurisdiction over the consolidated appeals pursuant to A.R.S. § 40-254.01(A).

## IV. The SIB Mechanism[3]

¶14 The SIB at issue in both the Eastern Group and Northern Group cases is a form of tariff that permits AWC, with Commission approval, to add surcharges to customers' water bills for up to five years to recoup certain capital costs (depreciation expenses and pre-tax return on investment) of defined infrastructure replacement projects that AWC completes prior to its next rate case. Capital expenditures subject to SIB-based surcharges include:

- Transmission and Distribution Mains
- Fire Mains
- Services, including service connections
- Valves and valve structures
- Meters and meter installations
- Hydrants

¶15 AWC may request surcharges only for completed projects that are "actually serving customers." Before imposing a surcharge, AWC must apply to the Commission and submit specified documentation. The Commission is required to approve or disapprove each surcharge application, and Staff and RUCO have 30 days from each application's filing to dispute a surcharge request. Each surcharge is "capped annually at five percent of the revenue requirement authorized" in Commission Decision No. 73736. AWC customers receive an "Efficiency Credit" of

---

[3] The SIB mechanism is a type of DSIC. At times, we discuss evidence and testimony regarding a DSIC that also applies to the SIB. However, the SIB mechanism that the Commission ultimately approved differs in some material respects from the DSIC that AWC initially proposed. Our legal analysis is based on the SIB's terms and methodology.

"five percent of the SIB revenue requirement."[4] The SIB mechanism contemplates an annual "true-up," or reconciliation, pursuant to which any "under- or over-collected SIB revenues shall be recovered or refunded" to customers "by means of a fixed monthly true-up surcharge or credit."

## DISCUSSION

### I.      Constitutionality of SIB Mechanism

**¶16**         RUCO contends the SIB mechanism violates the Arizona Constitution's mandate that the Commission determine the fair value of a public service corporation's property when setting rates.   According to RUCO, allowing the SIB-based surcharges in between rate cases circumvents this constitutional requirement.

**¶17**         Whether the SIB mechanism runs afoul of the constitution is a question of law that we review *de novo*.   *See Sierra Club – Grand Canyon Chapter v. Ariz. Corp. Comm'n*, ___ Ariz. ___, ¶ 15, ___ P.3d ___ (App. July 23, 2015) (appellate courts are not bound by Commission's legal conclusions and must "determine independently whether the Commission erred in its interpretation of the law"); *Ariz. Water Co. v. Ariz. Corp. Comm'n*, 217 Ariz. 652, 656, ¶ 10, 177 P.3d 1224, 1228 (App. 2008) (in reviewing Commission decisions, appellate courts review questions of law *de novo*).   RUCO bears the burden of persuasion.   *See* A.R.S. § 40-254.01(E) (litigant challenging Commission decision "must make a clear and satisfactory showing that the order is unlawful").

### A.      Fair Value Determination Requirement

**¶18**         "The Arizona Corporation Commission, unlike such bodies in most states, is not a creature of the legislature, but is a constitutional body which owes its existence to provisions in the organic law of this state."   *Ethington v. Wright*, 66 Ariz. 382, 389, 189 P.2d 209 (1948).   Under the Arizona Constitution, the Commission has plenary power to set "just and reasonable rates and charges" for public service corporations.   Ariz. Const. art. 15, § 3.   Article 15, Section 3 provides, in pertinent part:

---

[4]      The two five-percent figures apply to different amounts.   The cap on each surcharge is five percent of the revenue requirement authorized by the Commission in AWC's most recent rate case, whereas the efficiency credit is five percent of the SIB revenue requirement, as defined in the settlement agreements.

The corporation commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein . . . .

*Id*.

**¶19** The Commission's plenary power over rate-making, though, is not unfettered. Among other things, our constitution requires the Commission to "ascertain the fair value of property" when it sets rates. Ariz. Const. art. 15, § 14. Section 14's mandate "is an imperative. The commission is charged with an affirmative duty to act." *US West Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 201 Ariz. 242, 245, ¶ 11, 34 P.3d 351, 354 (2001) ("*US West*"). "[A]scertaining the fair value of property of public service corporations is a necessary step in prescribing just and reasonable classifications, rates, and charges." *Ethington*, 66 Ariz. at 392, 189 P.2d at 216; *see also Ariz. Corp. Comm'n v. Ariz. Pub. Serv. Co.*, 113 Ariz. 368, 370, 555 P.2d 326, 328 (1976) ("[T]he Commission is required to find the fair value of the company's property and use such finding as a rate base for the purpose of determining what are just and reasonable rates.").

**¶20** Surcharges trigger the constitutional requirement for a fair value determination. *See Residential Util. Consumer Office v. Ariz. Corp. Comm'n*, 199 Ariz. 588, 589, ¶ 1, 20 P.3d 1169, 1170 (App. 2001) ("*RUCO*"). Indeed, the parties here acknowledge that "[t]he SIB mechanism is a ratemaking device."

### B. Exceptions to Fair Value Determination Requirement

**¶21** Arizona's appellate courts have recognized two relatively narrow exceptions to the constitutional requirement that the Commission determine the fair value of a utility's property when setting rates: automatic adjustor clauses and interim rates. *See id*. at 591, ¶ 11, 20 P.3d at 1172. As we discuss *infra*, the SIB mechanism fits within neither exception.

### 1. Automatic Adjustor Clauses

**¶22** In approving the SIB mechanism, the Commission labeled it an adjustor mechanism. We disagree. *Cf. id*. at 593, ¶ 21, 20 P.3d at 1174 ("If ever there was a situation 'fraught with potential abuse,' it occurs

when the Commission of its own volition has the ability to declare any rate increase an 'automatic adjustment.'").

**¶23**       An automatic adjustor mechanism permits "rates to adjust automatically, either up or down, in relation to fluctuations in certain, narrowly defined, operating expenses." *Scates v. Ariz. Corp. Comm'n*, 118 Ariz. 531, 535, 578 P.2d 612, 616 (App. 1978). Adjustor mechanisms "usually embody a formula established during a rate hearing to permit adjustment of rates in the future to reflect changes in specific operating costs, such as the wholesale of gas or electricity." *Id.* The purpose of an automatic adjustor mechanism is to pass on to customers certain naturally fluctuating costs so that the utility neither benefits nor suffers a diminished return from those costs. *Id.*

**¶24**       William Rigsby, Chief of Accounting and Rates for RUCO, described the characteristics of a typical automatic adjustor clause as follows:

> When I think of an adjuster mechanism, I think of something along the lines of like a purchased gas adjuster mechanism, where the company has to . . . buy natural gas on the open market, or an electric company . . . has to buy power . . . on the grid in the wholesale market and so forth. And so the cost of that either natural gas or electricity is passed on to the ratepayer at no profit to the company, and that's the reason that it's implemented, is because of the price fluctuations of the commodity in the marketplace. It's a two-way street. If the prices go down, then consumers see a credit on the bill. If prices go up, then, of course, they go ahead and they pay that. Whereas in the case of . . . a DSIC, it's not a two-way street.

**¶25**       Rigsby's testimony is consistent with our own jurisprudence regarding automatic adjustor clauses. *See, e.g., Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 566, 569, 672 P.2d 495, 498 (App. 1983) (An automatic adjustment clause is "a device that allows a rate to adjust automatically, either up or down in relation to fluctuations in certain, narrowly defined, operating expenses."). RUCO's view is also aligned with the position Staff took at the outset of the Eastern Group Case. In Phase I of that proceeding, Staff stated that adjustor mechanisms are used to "allow utilities to pass on to customers changes in certain specific volatile costs outside of the utility's control, such as purchased power costs." Staff also correctly noted that "rate adjustors outside of a rate case

are the exception rather than the rule and [are] very limited in what they can do."

¶26     Under the SIB mechanism, surcharges will not fluctuate in amount within an annual cycle, and they will never decrease.  Moreover, AWC is being allowed to recoup *capital expenditures*, rather than "narrowly defined operating expenses" that naturally fluctuate.  As such, the SIB mechanism lacks essential attributes of an automatic adjustor clause and does not fall within that exception to the constitutional fair value determination requirement.

## 2.     Interim Rate

¶27     Interim rates assessed on a temporary basis in between rate cases may also be exempt from the constitutional fair value determination requirement.    The interim rate exception, though, "is limited to circumstances in which: (1) an emergency exists; (2) a bond is posted by the utility guaranteeing a refund to customers if interim rates paid are higher than the final rates determined by the Commission; and (3) the Commission undertakes to determine final rates after a valuation of the utility's property."  *RUCO*, 199 Ariz. at 591, ¶ 12, 20 P.3d at 1172.

¶28     During the Commission proceedings, AWC did not assert that emergency circumstances exist.  It instead described its infrastructure replacement needs as "extraordinary," and on appeal, it characterizes them as "exceptional."  AWC estimates the cost of needed improvements in the Eastern Group systems alone at $67 million over a ten-year period.

¶29     In the first phase of the Eastern Group Case, Staff did not quarrel with AWC's cost estimates or dispute the notion that infrastructure at the end of its useful life must be replaced.  Staff, however, did not consider AWC's situation an emergency or even an "extraordinary circumstance."     Jeffrey Michlik, Public Utilities Analyst for the Commission, testified:

> Q.  Do you consider infrastructure replacement to be an extraordinary circumstance?
>
> A.  No. . . .  That's something we expect of all the water companies that are public service companies here.  They should . . . supply customers with safe and reliable drinking water, with or without a DSIC.

Q.  Does the dollar amount of [the repairs] et cetera, drive the determination of whether something is extraordinary or not?

A.  It could, I mean if it's a huge amount.

Q.  . . . In this case [AWC] has talked about a $67 million expense that they anticipate in infrastructure replacement. . . . Does Staff consider that . . . significantly high to . . . deem that circumstance extraordinary?

A.  No.

Staff contended AWC was proposing a DSIC-type mechanism "for routine expenditures" that was "unjustified."  In a brief filed during Phase I of the Eastern Group Case, Staff wrote:

> [O]ther cost recovery mechanisms in use in Arizona all address extraordinary circumstances outside the utility's control, such as the fluctuating cost of natural gas or a federal mandate requiring the addition of massive amounts of plant.  This case seeks to recover the cost of replacing aging infrastructure.  The most basic laws of science and nature are that materials have a limited life-span.  They deteriorate and must be replaced.  [AWC] knew from the time it entered the market that someday the infrastructure would require replacement.  [AWC] could and should have anticipated this event and prepared for the same, but failed to do so.  [AWC] has some control over the rate of deterioration, by performing routine repairs and maintenance.  By their own admission, they cut maintenance expenses "to the bone" in 2008.  Staff has expressed concern that this has caused a more rapid deterioration of plant.  To a significant extent, the circumstances in which AWC now finds itself are of its own making.  The customer should not be required to bear the burden of the Company's decisions.

¶30        The ALJ's Opinion and Order noted "plentiful evidence" that certain AWC systems have degraded and that leaks and breaks are "occurring at excessive rates," requiring replacement of infrastructure "at a much faster rate than [AWC] has historically done."  But the ALJ concluded the situation was not "exceptional," so as to warrant "the creation of and authorization to use a nontraditional ratemaking device such as the DSIC."  *See RUCO*, 199 Ariz. at 592, ¶ 18, 20 P.3d at 1173

("Nothing in the record indicates that the increase in CAP water expense rose to the level of an emergency situation, thereby making [the utility] eligible for an interim rate.").

¶31      In considering the ALJ's findings and recommendations, the Commission similarly found no emergency and cited AWC's acknowledgement it had not been "'ambushed' by the need to replace its aging infrastructure." The Commission further noted that, "[i]n spite of AWC's decision to cut operating costs, AWC has consistently continued to pay its shareholders dividends, paying $4,287,600 in 2008, 2009, and 2010. . . . AWC increased the amount of dividends in 2011, after having held dividends steady for three years."

¶32      The settlement agreements that were later negotiated also do not state that an emergency exists or describe circumstances that would ordinarily be considered an emergency. *See, e.g., Garvey v. Trew*, 64 Ariz. 342, 354, 170 P.2d 845, 853 (1946) ("The word 'emergency' has a well understood meaning. It is defined and understood as: 'An unforeseen combination of circumstances which calls for immediate action.'"); *see also Hunt v. Norton*, 68 Ariz. 1, 11, 198 P.2d 124, 130 (1948) ("'Emergency' does not mean expediency, convenience, or best interests."). Instead, the Eastern Group Settlement Agreement provides, in pertinent part:

> It is necessary for AWC to undertake a variety of system improvements in order to maintain adequate and reliable service to existing customers. AWC is also required to complete certain system improvements in order to comply with requirements imposed by law. The Signatory Parties acknowledge that these projects are necessary to provide proper, adequate and reliable service to existing customers . . . .

In its final approval of the settlement agreements, the Commission again made no finding of emergency circumstances and noted AWC's concession "that its infrastructure replacement needs have been developing for a long time."

¶33      Because AWC neither claimed nor established the requisite emergency circumstances, the interim rate exception to the constitutional fair value determination requirement does not apply.

### C.     Compliance with Fair Value Determination Requirement

**¶34**        Absent a valid automatic adjustor mechanism or interim rate, the Commission "cannot impose a rate surcharge based on a specific cost increase without first determining a utility's fair value rate base." *RUCO*, 199 Ariz. at 589, ¶ 1, 20 P.3d at 1170.  The question thus becomes whether the SIB mechanism satisfies this constitutional mandate.

**¶35**        Arizona is a regulated monopoly state.  *Ariz. Corp. Comm'n v. Ariz. Water Co.*, 111 Ariz. 74, 76, 523 P.2d 505, 507 (1974).  "The monopoly is tolerated only because it is to be subject to vigilant and continuous regulation by the Corporation Commission."  *Davis v. Corp. Comm'n*, 96 Ariz. 215, 218, 393 P.2d 909, 911 (1964).  One important component of the Commission's "vigilant and continuous" regulatory role is determining and using fair value when setting a monopolistic utility's rates.   In discussing the fair value determination requirement more than a century ago, our supreme court stated:

> In order that the Corporation Commission might act intelligently, justly, and fairly between the public service corporations doing business in the state and the general public, section 14 was written into the Constitution . . . .  The "fair value of the property" of public service corporations is the recognized basis upon which rates and charges for services rendered should be made, and it is made the duty of the Commission to ascertain such value, not for legislative use, but for its own use, in arriving at just and reasonable rates and charges . . . .

*State v. Tucson Gas, Elec., Light & Power Co.*, 15 Ariz. 294, 303, 138 P. 781, 784-85 (1914); *see also Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 151, 294 P.2d 378, 382 (1956) ("It is clear . . . that under our constitution as interpreted by this court, the commission is required to find the fair value of the company's property and use such finding as a rate base for the purpose of calculating what are just and reasonable rates.").

**¶36**        A fundamental underpinning of the fair value determination requirement is the principle that the public has "the right to demand" that a public utility operate "with reasonable efficiency and under proper charges."  *City of Phx. v. Kasun*, 54 Ariz. 470, 475, 97 P.2d 210, 212 (1939); *see also Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 292, 830 P.2d 807, 813 (1992) (The Commission must use its "powers to regulate public service corporations in the public interest.").  Although our constitution

"does not establish a formula for arriving at fair value, it does require such value to be found and used as the base in fixing rates." *Simms*, 80 Ariz. at 151, 294 P.2d at 382; *see also Ariz. Corp. Comm'n v. Ariz. Water Co.*, 85 Ariz. 198, 202, 335 P.2d 412, 414 (1959) ("No formula is given for determining fair value . . . but the Commission must establish the rate base on the basis of fair value and that alone."). The fair value determination is intended to avoid "the harsh extremes of the rate spectrum" and to ensure that both consumers and public service corporations are treated fairly. *US West*, 201 Ariz. at 246, ¶ 21, 34 P.3d at 355.

¶37        The Commission suggests the SIB mechanism is constitutionally permissible because it is akin to step rate increases the Arizona Supreme Court discussed in *Arizona Community Action Ass'n v. Arizona Corp. Commission*, 123 Ariz. 228, 230, 599 P.2d 184, 186 (1979) ("*ACAA*"). We conclude otherwise.

¶38        *ACAA* includes *dicta* stating that, in the context of a rate case, the Commission may consider construction work in progress ("CWIP") in calculating a utility's fair value and may approve prospective percentage rate increases based on that fair value for a "limited period of time." *Id.* at 230-31, 599 P.2d at 186-87. The court observed that "[t]he adjustments ordered by the Commission in adding the CWIP to [the] determination of fair value were adequate to maintain a reasonable compliance with the constitutional requirements *if used only for a limited period of time*." *Id.* at 231, 599 P.2d at 187 (emphasis added). But even accepting this language as persuasive authority, as the Commission urges, the SIB mechanism at issue here differs materially from the step rate increases discussed in *ACAA*.

¶39        *ACAA* suggests that, with Commission authorization, a utility may charge stepped-up rates for a limited period of time to account for CWIP that was reviewed and approved by the Commission during a rate case. Here, however, much of the work that will be subject to SIB-based surcharges was not in progress when AWC's rate case was adjudicated. Under the settlement agreements, AWC may add improvement projects that will be subject to the SIB mechanism. *Cf. Consol. Water Utils., Ltd. v. Ariz. Corp. Comm'n*, 178 Ariz. 478, 482-83, 875 P.2d 137, 141-42 (App. 1993) (affirming non-inclusion of anticipated CWIP in establishing fair value rate base because, among other things, "[t]he amount of actual construction to be undertaken is not known and measureable"). And even if the Commission's review of new projects were to approximate the evaluation occurring during a rate case, unlike the two-year step increases in *ACAA*, the Commission here has authorized

AWC to seek surcharges for five years – the entire time span between rate cases.

**¶40**       Turning next to the question of whether the SIB mechanism's methodology satisfies the constitutional fair value determination requirement, we note that the documentation AWC must submit to obtain approval of surcharges is substantially less than what is required in a rate case. *See* A.A.C. R14-2-103(A)(1) (delineating financial and statistical information "required to be filed with a request by a public service corporation doing business in Arizona for a determination of the value of the property of the corporation and of the rate of return to be earned thereon, with regard to proposed increased rates or charges"). Moreover, it is undisputed that the Commission will not conduct a full fair value determination when it evaluates AWC's surcharge requests.

**¶41**       Rigsby testified that RUCO's primary concern with a DSIC-type mechanism is that the Commission will not "take into consideration all of the various ratemaking elements that would be looked at and scrutinized in a general rate case proceeding. That would include such things as revenues, expenses, and, of course, capital expenditures and the prudency considerations for each one of those ratemaking elements." The record supports this concern. As Rigsby observed, the Commission will only be "looking at the capital costs and depreciation expense associated with the plant additions under the SIB, as opposed to an actual test year, where we're looking at all of the ratemaking elements that would . . . include not only plant and accumulated depreciation and such, but other rate base items like accumulated deferred income taxes, customer deposits, working capital." In other words, the SIB mechanism focuses on the marginal effect of the SIB on fair value — an important, but quite limited assessment of fair value. Steve Olea, former Director of the Utilities Division for the Commission, confirmed that "[t]he only thing being considered in the SIB is the plant," not current operating and maintenance expenses, and he acknowledged that "the SIB application doesn't look at all the rate case elements that you would normally look at in a rate case proceeding."

**¶42**       To be sure, AWC must submit substantial information to the Commission when it requests a surcharge, including project details, "a calculation of the SIB revenue requirement and SIB efficiency credit," a true-up calculation for the prior surcharge period, an analysis of the impact of the SIB Plant on the fair value rate base, revenue, and the fair value rate of return, current balance sheets and income statements, and an earnings test schedule. But although infrastructure costs will be current

when the Commission considers surcharge requests, other critical valuation factors will be premised on a past rate case that, at the outer reaches of the SIB cycle, will be five years old. Such a process is inconsistent with the mandate that the Commission perform a fair value determination "at the time of inquiry." *See Ariz. Corp. Comm'n*, 85 Ariz. at 201-02, 335 P.2d at 414-15 ("A reasonable judgment concerning all relevant factors is required in determining the fair value of the properties at the time of inquiry. If the Commission abuses its discretion in considering these factors or if it refuses to consider all the relevant factors, the fair value of the properties cannot have been determined under our Constitution."); *Simms*, 80 Ariz. at 151, 294 P.2d at 382 ("Fair value means the value of properties at the time of inquiry.").

**¶43**       The abbreviated review under the SIB mechanism is particularly problematic given the five-year duration of the surcharges and the compounding effect those surcharges will have on ratepayers over that relatively lengthy period of time. Additionally, the Commission will not be assessing savings or other efficiencies attributable to capital improvements when it approves surcharges. *See Kasun*, 54 Ariz. at 475, 97 P.2d at 212 (public has right to demand that utilities operate with reasonable efficiency); *Scates,* 118 Ariz. at 534, 578 P.2d at 615 (A noted peril of a "piecemeal approach" to rate-making via tariff is that it serves "both as an incentive for utilities to seek rate increases each time costs in a particular area rise, and as a disincentive for achieving countervailing economies in the same or other areas of their operations.").

**¶44**       In defending its decisions, the Commission cites cases that confirm its broad discretion in setting rates. *See, e.g., Ariz. Corp. Comm'n v. Ariz. Pub. Serv. Co.*, 113 Ariz. at 371, 555 P.2d at 329. The Commission, however, lacks discretion to disregard or dilute state constitutional requirements, including the mandate that it determine fair value in setting rates.

**¶45**       Nor do we agree that *Scates* authorizes a rate increase without a fair value determination based on "exceptional circumstances," as the Commission and AWC suggest. *Scates* reversed an order approving increased telephone rates because the Commission "failed to make any examination whatsoever of the company's financial condition, and to make any determination of whether the increase would affect the utility's rate of return." 118 Ariz. at 537, 578 P.2d at 618. In language unnecessary to its holding, *Scates* continued:

> There may well be exceptional situations in which the Commission may authorize partial rate increases without requiring entirely new submissions. We do not decide in this case, for example, whether the Commission could have referred to previous submissions without some updating or whether it could have accepted summary financial information. We do hold that the Commission was without authority to increase the rate without any consideration of the overall impact of that rate increase upon the return [of the company], and without, as specifically required by our law, a determination of [the company's] rate base.

*Id.*

**¶46**        To the extent this *dicta* in *Scates* can be read as suggesting that an "exceptional situation" may excuse the constitutional requirement for a fair value determination, we disagree. No Arizona court has so held, and since *Scates*, we have reaffirmed that, absent a valid interim rate or automatic adjustor mechanism, the Commission may not impose rate surcharges without first determining fair value. *See RUCO*, 199 Ariz. at 589, ¶ 1, 20 P.3d at 1171.

**¶47**        AWC's reliance on *US West* is similarly unavailing. In a fundamentally different context, our supreme court held in *US West* that although a fair value determination is constitutionally mandated when rates are set, in a *competitive* market, the Commission has "broad discretion" to determine what weight to give that determination. *US West*, 201 Ariz. at 246, ¶¶ 19-21, 34 P.3d at 355. We are not dealing here with a competitive market. Nor is our focus on how the Commission may weigh and apply fair value in approving surcharges. At issue is whether the SIB mechanism provides the functional equivalent of a fair value determination. *See Ariz. Corp. Comm'n*, 85 Ariz. at 202, 335 P.2d at 414 (The Commission abuses its discretion if "it refuses to consider all the relevant factors" in determining fair value.). Moreover, *US West* confirms that in the context of a regulated monopoly, the Commission must both determine and use fair value:

> [W]hile the constitution clearly requires the Arizona Corporation Commission to perform a fair value determination, only our jurisprudence dictates that this finding be plugged into a rigid formula as part of the rate-setting process. . . . As we have seen, a line of cases nearly as old as the state itself has sustained the traditional formulaic

approach. The commission . . . correctly points out, however, that those decisions were rendered during a time of monopolistic utility markets. In such a setting, where rates were determined by giving the utility a reasonable return on its Arizona property, the fair value requirement was essential. *We still believe that when a monopoly exists, the rate-of-return method is proper.*

201 Ariz. at 245-46, ¶¶ 17-19, 34 P.3d at 354-55 (emphasis added); *see also Phelps Dodge Corp. v. Ariz. Elec. Power Coop., Inc.*, 207 Ariz. 95, 105 n.8, ¶ 21, 83 P.3d 573, 583 n.8 (App. 2004) ("Although [*US West*] held that this rate-of-return method for rate setting may be inappropriate in a competitive environment, it affirmed the supreme court's long-standing view that this method is properly employed in traditional, non-competitive markets.").

¶48 The Commission and AWC raise colorable policy arguments in support of flexible rate-making tools like the SIB and stress that other jurisdictions have approved similar devices.[5] We recognize the Commission's legitimate desire to "initiate innovative procedures in an attempt to deal promptly and equitably with increasingly complex regulatory matters," and its corresponding goal of avoiding "a constant series of extended rate hearings [that] are not necessary to protect the public interest." *ACAA*, 123 Ariz. at 230-31, 599 P.2d at 186-87. But the question before us is not whether the SIB mechanism represents prudent public policy. Our focus is on the propriety of that mechanism given the unique and express provisions of our state constitution.

¶49 The fair value determination requirement imposed by the Arizona Constitution may be cumbersome, time-consuming, and expensive, as the Commission asserts. The answer, though, is not to

---

[5] Also in the record are materials describing potentially negative policy implications of DSIC-type mechanisms, including circumvention of regulatory review of rate base items for prudence and reasonableness, elimination of incentive to control costs between rate cases, and rewarding water companies that "imprudently fall behind in infrastructure improvements." Additionally, AWC's reliance on "regulatory lag" as a basis for implementing a DSIC-type mechanism caused Staff to note during Phase I of the Eastern Group Case that "[w]hile utilities tend to decry regulatory lag as causing them to have to wait too long to recover costs, regulatory lag serves a useful purpose in incentivizing a utility to operate efficiently and minimize costs."

ignore it or to circumvent the constitutional mandate by judicial fiat. *See* Ariz. Const. art. 2, § 32 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."). Although the Arizona electorate has refused to amend the constitutional fair value requirement in recent years,[6] "[s]hould they think it wise, our citizens are free to amend the Arizona Constitution to reflect changed circumstances." *US West*, 201 Ariz. at 245, ¶ 12, 34 P.3d at 354. Meanwhile, under appropriate circumstances, the Commission may employ alternative rate-making devices approved by our appellate courts if it complies with the well-established requirements for those mechanisms.

**¶50**       Because the SIB mechanism does not comply with the Arizona Constitution's mandate that the Commission determine and use fair value when setting a monopolistic utility's rates, we vacate the Commission's approval of that rate-making device.

## II.    Return on Equity

**¶51**       RUCO also contends the adoption of a 10.55% ROE was arbitrary given the Commission's corresponding approval of the SIB mechanism.  To the extent this argument is not moot by virtue of our disapproval of the SIB mechanism, we disagree.

**¶52**       "[T]he Commission is constitutionally mandated to set fair rates of return on fair value base of public service utilities." *Ariz. Corp. Comm'n v. Citizens Utils. Co.*, 120 Ariz. 184, 188, 584 P.2d 1175, 1179 (App. 1978).  "This function cannot be performed by the judiciary and the judicial role is limited . . . to determining whether the Commission's decision was supported by substantial evidence, was not arbitrary and was not otherwise unlawful." *Id.*  The Commission exercises discretion in setting an appropriate rate of return. *Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n*, 178 Ariz. 431, 434, 874 P.2d 988, 991 (App. 1994).

**¶53**       The Commission considered substantial evidence relevant to the ROE determination.  Some of that evidence, including expert opinions, suggested that AWC required both a SIB-type mechanism and a higher

---

6      Arizona voters defeated proposed constitutional amendments to the fair value determination requirement in 1984, 1988, and 2000. *US West*, 201 Ariz. at 245 n.2, ¶ 12, 34 P.3d at 354.

ROE to complete necessary projects and obtain financing. *See Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 693 (1923) ("The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."). Other testimony posited that the efficiency credit included in the settlement agreements effectively reduces the ROE. Opinions about the appropriate ROE ranged from 8.5% to 12.5%. RUCO took the position that the ROE and SIB mechanism are, to some degree, duplicative, and that the SIB reduces AWC's risk "because it improves cash flow and reduces regulatory lag related to cost recovery of qualifying infrastructure investment."

¶**54**         Faced with a conflict in the evidence, a majority of the Commission opted to authorize the 10.55% ROE, even while approving the SIB mechanism.[7] There is support for that decision in the record, and our role is not to reweigh the evidence to determine whether we would reach the same conclusion. *See DeGroot v. Ariz. Racing Comm'n,* 141 Ariz. 331, 335-36, 686 P.2d 1301, 1305-06 (App. 1984) (appellate court does not reweigh evidence to resolve perceived conflicts). We find no abuse of discretion in setting the ROE at 10.55%.

---

[7]      Commissioners Brenda Burns and Robert Burns dissented. In his written dissent, Commissioner R. Burns stated that the final decision "allows for both a SIB mechanism and a higher return on equity . . . which leads to duplicative recovery." He concluded that permitting "both a SIB and an elevated ROE is not in the best interest of the ratepayers."

**CONCLUSION**

**¶55** For the reasons stated, we vacate the Commission's approval and adoption of the SIB mechanism but affirm its determination of the appropriate ROE.



**Ruth A. Willingham** · **Clerk of the Court**
F I L E D : ama